**UNITED STATES of America, Appellee,**

v.

**Juliana M. CASSILIANO,
Defendant–Appellant.**

**Docket No. 97–1215.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 2, 1998.

Final briefs submitted Feb. 9, 1998.

Decided March 5, 1998.

Thomas Spina, Jr., Assistant United States Attorney, Albany, NY (Thomas J. Maroney, United States Attorney for the Northern District of New York, on the brief), for Appellee.

Elena C. Vaida, Albany, NY, for Defendant–Appellant.

Before: KEARSE and WALKER, Circuit Judges, and WEINSTEIN, District Judge.*

KEARSE, Circuit Judge:

Defendant Juliana M. Cassiliano appeals from a judgment entered in the United States District Court for the Northern District of New York following her plea of guilty before Lawrence E. Kahn, *Judge*, convicting her of wire fraud, in violation of 18 U.S.C. § 1343 (1994), sentencing her principally to a

* Honorable Jack B. Weinstein, of the United States District Court for the Eastern District of New York, sitting by designation.

prison term of 12 months and one day, to be followed by a three-year term of supervised release, and ordering her to pay $5,000 to the government as restitution. Pursuant to Sentencing Guidelines ("Guidelines") § 3C1.1, the sentence included an enhancement for obstruction of justice on the ground that, after agents of the Federal Bureau of Investigation ("FBI") confronted Cassiliano with evidence of her unlawful conduct and sought her cooperation in the investigation of others, Cassiliano proceeded to inform a target of the investigation, with whom she had collaborated, of the existence of the investigation. On appeal, Cassiliano challenges the enhancement, contending principally that her conduct was not, in fact, meant to be obstructive, and that alerting an individual that he is the target of an investigation is not, as a matter of law, an obstruction of justice within the meaning of § 3C1.1. Finding no basis for reversal, we affirm.

## I. BACKGROUND

The material events are undisputed by the parties hereto. In 1992, Cassiliano, an attorney who had been counsel to various New York State ("State") agencies and legislative committees in the 1980s, participated in a scheme to extort $20,000 from Petron Oil Corporation ("Petron"). Petron's owner, Charles Hurchalla, had sought Cassiliano's assistance in expediting the payment of certain tax refunds to which Petron was entitled from the State. Cassiliano agreed to help, and it was eventually agreed that Petron would pay her one percent of any expedited refund. For several months, Cassiliano used her professional contacts within the State government, along with her prior romantic relationship with Keith Hercules ("Hercules"), who was then a deputy commissioner of the State's Office of General Services, to expedite Petron's refunds, and she was paid the one-percent compensation. In June 1992, however, Cassiliano telephoned Petron to advise that a legal question had arisen as to whether Petron was entitled to the refunds; at the urging of Hercules, she in-

formed Petron that it would have to pay $10,000 in order to bribe State officials to release the refunds.

Unbeknownst to Cassiliano, Hurchalla had been acting as an informant for the government in an unrelated investigation, and he informed the FBI of Cassiliano's demand. In September 1992, Hurchalla sent Cassiliano $5,000, which had been provided by the government as part of its investigation of Hurchalla's allegations, and FBI agents observed Cassiliano and Hercules retrieving the money together. On the following day, Cassiliano telephoned Hurchalla to say that she would need $20,000, rather than $10,000, to secure the refunds. Thereafter, Hurchalla gave Cassiliano an additional $5,000.

On December 1, 1992, FBI agents approached Cassiliano, confronted her with evidence they had collected against her, and offered her the opportunity to cooperate in their investigation of a fuel tax evasion scheme. She agreed to cooperate, and she promptly delivered to the government the second $5,000 payment she had received from Hurchalla. Her cooperation was also to include pleading guilty to wire fraud, assisting the government in gathering additional evidence, and testifying for the government at future proceedings.

One of the principal targets of the government's investigations was Hercules. Shortly after agreeing to cooperate, Cassiliano made numerous attempts to—and ultimately did—contact Hercules to alert him to the investigation. Disappointed by his cool response, however, she contacted the FBI on December 9 and volunteered a description of her attempts and eventual conversation. According to the FBI report of that interview, Cassiliano began continual attempts to call Hercules directly on December 3, without success. She then tried to contact a former associate who knew Hercules; after receiving no response to numerous messages left on the associate's answering machine, Cassiliano left a message on that machine on December 4, saying that she wanted the associate to get in touch with Hercules and to tell him that Cassiliano was in trouble and that Hercules too was in trouble. Cassiliano also made a series of calls to track down Hercules's

brother Cedric ("Cedric"). On December 5, she reached Cedric and told him that she had gotten Hercules into serious work-related trouble; she wanted and expected Cedric to relay that message to Hercules. Later that day, Cassiliano finally managed to speak to Hercules directly, and she informed him of the FBI's investigation.

Cassiliano told the agents in the December 9 interview that although she felt that she had been asked not to contact Hercules, she had called him for the purpose of letting him "know about the problem" and of "find[ing] out from [him] what she was supposed to do; whether or not she was suppose[d] to lie to the FBI." She revealed to the agents that she had lied to other agents the previous week, concealing the fact that Hercules received $3,500 of the first $5,000 she had obtained from Hurchalla. She contacted Hercules both to alert him to the FBI investigation and "to confirm whether or not she should keep lying to the FBI," or whether he himself was going to disclose the truth. Cassiliano told the agents that Hercules was entirely unresponsive to her statements, and that she concluded that her relationship with him had ended. She thus decided to tell the FBI of her efforts to reach him.

In October 1996, Cassiliano pleaded guilty to one count of wire fraud, in violation of 18 U.S.C. § 1343. In an interview with the probation officer responsible for preparing her presentence report ("PSR"), she explained that when she made her numerous attempts to reach Hercules,

> [o]bstruction of justice never even crossed my mind because I don't think I would have thought of it in those terms.
>
> When I think of obstruction of justice I think of hiding evidence, or helping someone to escape. Doing something that would change criminal conduct. But in this case, whatever was done was already done. . . .
>
> . . . .
>
> . . . . All I did was let Keith know that the FBI had contacted me. I didn't say, "lets [sic] go over everything and make sure we say the same thing," or anything like that.

.... I still don't think I obstructed justice, the[ FBI agents] just didn't get the more that they wanted.

(PSR ¶ 18.) The PSR recommended enhancing Cassiliano's offense level by two steps for obstruction of justice. Cassiliano opposed the enhancement. She did not deny any of the statements attributed to her in the FBI report; rather, she argued that her conduct was consistent with her being obsessed with Hercules and wanting to speak to him for purely personal reasons, and that her conduct "simply d[id] not rise to the level of obstruction." (Letter from Cassiliano's counsel to the district judge dated March 24, 1997, at 1–2.)

> What she really wanted to know was whether Keith Hercules was going to be there for her; whether he was going to tell the truth about what happened; whether he expected her to lie and take the fall for this offense alone. She was not trying to stymie or hinder the government's investigation, rather, she was engaging in further self-destructive and impulsive behavior in order to test Keith Hercules' feelings or lack thereof for her. There was simply no intent to obstruct the government's investigation.

(*Id.* at 2.)

The district court rejected Cassiliano's view and adopted the PSR's recommendation. The court found that Cassiliano had

> willfully obstructed justice when she notified her unindicted conspirator of the pendency of the FBI investigation in the instant offense. As defendant's own statements acknowledge, she was unhappy with the nature of the FBI's p[ro]spective investigation of her friend, ... she was fully cognizant of the fact that by tipping him off she would prevent the collection of any further evidence, but she still embarked on that course.

(Sentencing Transcript dated March 27, 1997 ("Tr."), at 16–17.) Cassiliano was sentenced as indicated above, and this appeal, permitted by the plea agreement, followed.

## II. DISCUSSION

Under the Guidelines, a defendant is to have her offense level increased by two steps if she "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." Guidelines § 3C1.1. Cassiliano contends principally (a) that the district court erred as a matter of law in concluding that alerting Hercules to the FBI investigation constituted an obstruction of justice at all, or that it constituted an obstruction with respect to the "instant offense" within the meaning of § 3C1.1, and (b) that the court erred in finding that her conduct constituted an obstruction that was in fact willful.

■ An enhancement for obstruction of justice is subject to a mixed standard of review. The sentencing court's findings as to what acts were performed, what was said, what the speaker meant by her words, and how a listener would reasonably interpret those words will be upheld unless they are clearly erroneous. *See, e.g., United States v. Shoulberg,* 895 F.2d 882, 884 (2d Cir.1990); *United States v. Stroud,* 893 F.2d 504, 506–07 (2d Cir.1990). A ruling that the established facts constitute obstruction or attempted obstruction under the Guidelines, however, is a matter of legal interpretation and is to be reviewed *de novo, see, e.g., id.* at 507; *United States v. Perdomo,* 927 F.2d 111, 118 (2d Cir.1991), giving "due deference to the district court's application of the guidelines to the facts," 18 U.S.C. § 3742(e) (1994). Under these standards, we see no basis for reversal.

### A. *Obstruction With Respect to the "Instant Offense"*

■ By its terms, the obstruction-of-justice enhancement provided in § 3C1.1 applies only if a defendant's obstructive conduct occurred "during the investigation, prosecution, or sentencing of the instant offense." Cassiliano challenges the application of this Guideline to her, arguing both that simply alerting an individual that he is the target of an investigation does not constitute obstruction, and that alerting Hercules that he was a target is not within the scope of § 3C1.1

because Hercules's wire fraud offense could not be deemed the "instant offense." We need not decide these questions insofar as they relate to Hercules's offense, for Cassiliano's view of the nature of her conduct is unduly narrow.

We, like our sister Circuits, have read the term "instant offense" in § 3C1.1 to refer to the defendant's offense of conviction, *see, e.g., United States v. Perdomo,* 927 F.2d at 118, and have interpreted the limiting use of that term as requiring that the "obstruction ... be tied to a count of conviction," *United States v. Sisti,* 91 F.3d 305, 314 (2d Cir.1996) (noting that the obstructive conduct preceded the investigation of three of four counts of conviction, making the enhancement proper only with respect to the fourth count). *See also United States v. Horry,* 49 F.3d 1178, 1180–81 (6th Cir.1995) (enhancement improper where defendant's obstructive action assisted her husband in an unrelated offense); *United States v. Woods,* 24 F.3d 514, 516–17 (3d Cir.1994) (enhancement improper for the defendant's false denials of other persons' involvement in a robbery of which he was not convicted). When the defendant's offense of conviction is not a substantive offense but rather is conspiracy, a crime that requires at least two actors, the "instant offense" requirement is satisfied if the defendant obstructed or attempted to obstruct justice on behalf of a coconspirator. *See, e.g., United States v. Fernandez,* 127 F.3d 277, 284 (2d Cir.1997); *United States v. Valdez,* 16 F.3d 1324, 1335–36 (2d Cir.1994). *Accord United States v. Powell,* 113 F.3d 464, 469 (3d Cir. 1997); *United States v. Acuna,* 9 F.3d 1442, 1446 (9th Cir.1993); *United States v. Bernaugh,* 969 F.2d 858, 861 (10th Cir.1992).

The district court referred to Hercules as Cassiliano's "unindicted conspirator," and the government argues that the obstruction enhancement here is proper under *Fernandez* and *Valdez.* But those cases cannot, without significant extension, be applied here because Cassiliano was convicted only of the substantive wire fraud offense, not of conspiracy. We have not previously been confronted with the "instant offense" issue with respect to a defendant who was not convicted of conspiracy but whose obstructive conduct could be found to have impeded the investigation, prosecution, or sentencing of another person who had engaged in the same or closely related criminal conduct. Language in cases decided by other Circuits seems to leave the door ajar. *See, e.g., United States v. Horry,* 49 F.3d at 1180–81 (where wife was convicted of wire fraud, enhancement imposed because she helped her husband to escape from prison was improper where "[n]othing in the record shows that her husband was involved in any way in the [wire] fraud" of which wife was convicted); *United States v. Bernaugh,* 969 F.2d at 861 ("the section 3C1.1 enhancement applies where a defendant attempts to obstruct justice in a case *closely related to his own,* such as that of a codefendant" (emphasis added)). If the "instant offense" requirement can be satisfied by a close relationship between the actors' conduct despite the absence of a conspiracy conviction, the joint conduct in the present case would plainly suffice, for Cassiliano herself revealed that she and Hercules had collaborated in planning the extortion and had shared in the proceeds, and the FBI agents observed them collecting the first payment together.

Whether or not such joint conduct, not charged as conspiracy, meets the "instant offense" requirement, we find that that requirement was satisfied here because Cassiliano's conduct had the potential for impeding the investigation not only of Hercules's offense but of her own as well. When Cassiliano commenced her frenzied attempts to talk with Hercules, the government had not completed its investigation of Cassiliano. It was clear from the government's surveillance that Hercules had knowledge of Cassiliano's wire fraud and that he could have been a source of evidence against her. According to Cassiliano, it was Hercules who had planned the fraud and told her what to say to Petron; yet the government was not required to accept at face value any and all statements Cassiliano made to the agents in the wake of their confrontation of her on December 1. Indeed, as Cassiliano revealed on December 9, she had not, in that initial confrontation, been entirely truthful. Plainly the government had less than complete knowledge as to the details of the crime, and we see no error in the district court's finding that by alerting

Hercules, Cassiliano "prevent[ed] the collection of *any* further evidence" (Tr. 17 (emphasis added)) during "the FBI investigation in the instant offense" (*id.*), including evidence of facts that Cassiliano may have chosen not to reveal as to her own culpability. We also think it clear that Cassiliano's efforts to discuss with Hercules whether they would both lie to the government constituted an attempted obstruction.

In sum, even without consideration of the obstructive effect of Cassiliano's telephone calls on the investigation and prosecution of Hercules, her conduct was properly viewed as an effort to impede the investigation of the offense of which she herself was eventually convicted.

### B. *Willfulness*

■ The § 3C1.1 enhancement for obstruction is to be imposed only if the obstruction, or attempted obstruction, was "willful[ ]." Because that term "implies a *mens rea* requirement," *United States v. Reed,* 49 F.3d 895, 900 (2d Cir.1995), we have generally limited the application of the Guideline to those cases in which "the defendant had the specific intent to obstruct justice," *United States v. Hernandez,* 83 F.3d 582, 585 (2d Cir.1996); *see, e.g., United States v. Defeo,* 36 F.3d 272, 276 (2d Cir.1994) (defendant must have "consciously acted with the purpose of obstructing justice" (internal quotation marks omitted)); *United States v. Stroud,* 893 F.2d at 507–08. In some cases, however, conduct may be "so inherently obstructive of the administration of justice" that the enhancement should be applied if the defendant deliberately engaged in that conduct, regardless of her specific purpose. *United States v. Reed,* 88 F.3d 174, 178 (2d Cir.1996) (intentional failure to appear for sentencing); *United States v. Reed,* 49 F.3d at 900 (same).

■ The facts necessary to support an obstruction-of-justice enhancement need be proven only by a preponderance of the evidence. *See, e.g., United States v. Hernandez,* 83 F.3d at 585. In determining the intent with which a defendant acted, the district court is entitled to rely on circumstantial evidence and on all reasonable inferences that may be drawn from all of the evidence.

*See, e.g., United States v. Sisti,* 91 F.3d at 313.

■ We note that Cassiliano contends that, under the § 3C1.1 commentary, the statements she made to the FBI and to the probation officer should be construed in the light most favorable to her. We reject that contention. The commentary on which she relies states that "[i]n applying [§ 3C1.1] *in respect to alleged false testimony or statements* by the defendant, such testimony or statements should be evaluated in a light most favorable to the defendant." Guidelines § 3C1.1 Application Note 1 (emphasis added). In this case, however, the enhancement was not imposed on account of "false testimony or statements." Rather, it was imposed because of Cassiliano's conduct in contacting Hercules and alerting him to the FBI's investigation. The statements to which she refers were merely her after-the-fact explanations for conduct that could reasonably be viewed as intentionally obstructive. It lay within the province of the district court, as the finder of fact, to determine the motive for Cassiliano's actions and what she meant by her statements to Hercules, and the court was free to disbelieve her explanations.

■ The record reveals no error in the district court's finding that Cassiliano's obstructive conduct was willful. According to her own statements, Cassiliano knew that she was not supposed to alert Hercules to the investigation. She nonetheless made assiduous efforts to reach him, with the admitted purpose of so alerting him and asking him whether she should lie to the FBI. The court was easily entitled to infer that Cassiliano, well-educated and versed in the law, "was fully cognizant of the fact that by tipping him off she would prevent the collection of any further evidence." Indeed, her calls for the purpose of alerting Hercules to the investigation and discussing whether they would lie to the investigating authorities were so patently prejudicial to the investigation that, once the calls were found to have been made for those purposes, the conclusion that there was an intent to obstruct is virtually inescapable. The enhancement was proper.

## CONCLUSION

We have considered all of Cassiliano's contentions on this appeal and have found in them no basis for reversal. The judgment of conviction is affirmed.