UNITED STATES of America,
Appellee,

v.

Sabrina PETERSON, Shirley Ann Davenport, Lonzo Harden,
Defendants,

Art Williams, Roland Onaghinor,
Defendants–Appellants.

Docket Nos. 02–1313(L), 03–1187(CON).

United States Court of Appeals,
Second Circuit.

Argued: May 3, 2004.

Decided: Oct. 5, 2004.

Frank H. Sherman, Assistant United States Attorney, Rochester, NY, for Appellee (Michael A. Battle, United States Attorney for the Western District of New York, on the brief).

Mark D. Hosken, Assistant Federal Defender for the Western District of New York, Rochester, NY, for Defendant–Appellant Art Williams (Jay S. Ovsiovitch, of counsel, on the brief).

Jeffrey Wicks, Jeffrey Wicks, PLLC, Rochester, NY, for Defendant–Appellant Roland Onaghinor.

Before: CARDAMONE, JACOBS, Circuit Judges, and KORMAN, District Judge *

KORMAN, Chief Judge.

Art Williams and Roland Onaghinor were convicted for their roles in a conspiracy to distribute heroin. Both appeal from their judgments of conviction on the ground that the trial judge mishandled a note from the jury that revealed jury misconduct. Specifically, they claim that the judge insufficiently questioned the jurors regarding possible jury taint and that the judge improperly met with one juror and with defense counsel without defendants being present. Williams also appeals his sentence on the ground that the imposition of a two-level enhancement for obstruction of justice was improper.

### Background

On December 16, 1999, defendants Williams and Onaghinor were named in a superseding indictment for their roles in a conspiracy to distribute heroin that lasted from January 1991 until August 1999. At trial, testimony was heard from two of their co-defendants, Sabrina Peterson and Lonzo Harden, as well as four of their other co-conspirators, Ann Marie Harden, Katrina Harden, Diane Johnson, and Gwendolyn Ladd. That testimony, along

---

\* The Honorable Edward R. Korman, Chief Judge of the United States District Court for the Eastern District of New York, sitting by designation.

with the testimony of law enforcement officers, provided a detailed picture of the defendants' conspiracy.

In January, 1991, Williams began to meet with his co-defendant Gwendolyn Ladd to discuss selling heroin. They jointly owned a home in Tampa, Florida, but they discussed selling heroin in Rochester, New York, where Williams also owned a home, and in Michigan. This lasted until March, 1991, when Ms. Ladd was arrested on federal drug charges. Subsequently, Williams began trafficking heroin with his other co-defendants out of his home in Rochester. Specifically, Williams and his late wife, Mary Panibianci, began supplying heroin from their home in Rochester to co-conspirator Ann Marie Harden and her husband, Lonzo Harden. The Hardens would resell the heroin to an individual they knew in Buffalo, New York. This continued until the latter half of 1991 when the Hardens were arrested and began serving prison sentences. At that point, the Hardens' daughter, Katrina Harden, stepped into their role by continuing to purchase heroin from Williams and Panibianci and delivering it to the Hardens' contact in Buffalo.

While the Hardens were in prison, Williams also established contact with a Pakistani source for heroin named Sharif whom Ann Marie Harden knew. Through this contact, Williams gained another heroin supplier named Uncle Peter, who lived in California. According to Sabrina Peterson, Williams sent her and Shirley Ann Davenport to purchase heroin from Uncle Peter several times in the mid–1990s. Meanwhile, when Ann Marie Harden was released from prison in 1992, she reestablished contact with Sharif. Sharif began sending her heroin-impregnated paper to addresses that she, and later Williams, supplied. Ann Marie Harden and Williams were able to process two to five grams of heroin from each sheet of paper. This process continued until 1997.

In October 1995, Williams also began traveling to New York City, where he met co-defendant Roland Onaghinor. Onaghinor served as an additional source of heroin for Williams until the spring of 1998. On numerous occasions, Williams sent Sabrina Peterson and Shirley Ann Davenport to New York to meet with Onaghinor and purchase heroin for resale. Peterson would take between $5,000 and $8,000 cash from Williams to pay for the heroin. On several later occasions, Peterson and Davenport met Onaghinor in Atlanta to purchase heroin, and Onaghinor visited Williams in Tampa, Florida—where Williams had relocated—at least three times.

Sabrina Peterson estimated that Williams maintained a running debt to Onaghinor for heroin reaching between $10,000 and $15,000. Eventually, Williams identified Onaghinor's source in New York City as a man named Mohammed and began to deal directly with him. Williams asked Peterson to fly to New York on at least three occasions to purchase heroin from Mohammed. Ann Marie Harden estimated that in an average year between 1992 and 1997, Williams received between six and ten ounces of heroin from all of his sources combined.

In late 1997, Williams decided to visit Sharif in Canada in order to purchase a larger quantity of heroin. On January 20, 1998, Williams, Lonzo Harden and Sabrina Peterson attempted to drive to Montreal to meet with Sharif. After stopping in New York to purchase heroin from Mohammed, the three were denied entry into Canada because of Lonzo Harden's criminal record. Later, Lonzo Harden asked his daughter, Katrina Harden, to visit Sharif in Niagara Falls, Canada and purchase heroin for them. After one success-

ful trip where Sharif sold Katrina Harden one package of heroin, Katrina Harden asked Shirley Ann Davenport to accompany her on a second trip. This time, Sharif gave Harden and Davenport two packages of heroin, which they divided between Williams and Lonzo Harden. Williams and Lonzo Harden arranged a third meeting with Sharif, where Davenport purchased approximately 10 more grams of heroin in the summer of 1999.

In the spring of 1999, Sabrina Peterson sold 13 grams of heroin to an undercover drug enforcement officer, and near the end of the summer of 1999, law enforcement executed search warrants on the residences of Diane Johnson and Sabrina Peterson in Tampa, Florida. These events ultimately led to the original indictment in this case, filed on August 12, 1999, which charged Williams with 14 offenses. That indictment was superseded on December 16, 1999. The superseding indictment charged Williams and Onaghinor with participation in a conspiracy to possess with the intent to distribute, and to distribute, one kilogram or more of heroin, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). The superseding indictment also charged Williams with 13 counts of using a communication facility in committing, or causing or facilitating the commission of conspiracy to possess with the intent to distribute, and to distribute, heroin, in violation of 21 U.S.C. § 843(b) and 18 U.S.C. § 2.

On November 21, 2001, after a two-week trial, Williams was found guilty of all counts and Onaghinor was found guilty of count one. The jury found that Williams conspired to distribute one kilogram or more of heroin and that Onaghinor conspired to distribute less than 100 grams of heroin. On May 16, 2002, Onaghinor was sentenced to a term of imprisonment of 78 months, a period of supervised release of three years, and a $100 special assessment.

On March 5, 2003, Williams was sentenced to a term of imprisonment of 216 months on count one, and a term of imprisonment of 48 months on each of counts two through fourteen, each term of imprisonment to run concurrently with the others. He was also sentenced to three years of supervised release, a fine of $3,000 on count one, and a special assessment of $1,400.

Neither Williams nor Onaghinor challenges the sufficiency of the evidence of their guilt on appeal. Instead, they both challenge the trial judge's handling of a note from the jury during deliberations, and Williams challenges the imposition of a two-level sentence enhancement for obstruction of justice.

### Discussion

### I. Jury Misconduct

Defendants Onaghinor and Williams both appeal from Judge Larimer's handling of a note received from the jury after deliberations had begun. The United States Attorney concedes that the note raised the issue of juror misconduct. The only question is whether Judge Larimer's response was adequate. The jury began its deliberations at 8:30 a.m. on November 21, 2001. Shortly thereafter, Judge Larimer received a note from the jury that read as follows:

Dear Judge Larimer: At 11 a.m. juror number three disclosed that she during the trial came to believe that she has been acquainted with both defendants in the past. She's also stated that she felt this way before we began deliberations this morning. She also stated that she just wants the deliberations to be over. The other 11 jurors do not feel comfortable continuing deliberation with juror number three. Please advise.

Judge Larimer convened a conference in chambers with all counsel to discuss the note.

Judge Larimer began by stating: "My reaction is, without even getting your comments, is that I need to talk to this juror on the record." He expressed his doubt that juror number three could have actually known the two defendants, and speculated that the juror "doesn't want to deliberate anymore." Judge Larimer proposed that he speak with juror number three on the record but outside the presence of counsel because "it might encourage candor if she didn't have [counsel] peering at her." He assured counsel that, if after hearing the record of his conversation with the juror, "there's some questions you think I should have asked, we can always call her back and I can ask her those." Defense counsel agreed to this plan without objection. Judge Larimer then asked the jury to suspend its deliberations until the issue was resolved and called juror number three to chambers for questioning.

Judge Larimer opened the conversation with juror number three by stating, "[l]et me say, first of all, I don't want you to discuss here with me how the jury is split or how they're going. I don't want to know anything about that." Then he turned to the jury's note. Juror number three confirmed that the note was accurate and explained that she thought she had met the defendants while she was in college in 1977. She believed that she saw them dealing drugs on more than one occasion in a bar called the Inn Between in Geneseo, New York. When asked at what point during the trial she remembered meeting the defendants, juror number three responded that it was when she heard Onaghinor's habit of making a clicking sound whenever he was thinking.

Juror number three explained her decision to reveal her recollection to the other jurors as follows: "I did say it yesterday to another one of the jurors that I thought—that I thought of that.... I thought when you were giving the instructions, that I should tell you last night. And then after a lot of the things that the people were saying in there, I thought that I better say this because I didn't want to get into any kind of trouble." She continued: "I find that after looking at the stuff, the evidence, I'm finding that yeah, I'm thinking of that when I'm—they're asking what you think about the defendants. I feel like I can't make an unbiased decision." When Judge Larimer asked juror number three specifically what she told the other jurors, the following exchange took place:

The Juror: I told the one guy yesterday just what I'm—that I think, you know, they don't listen to me. They think I'm crazy and they're very rude. But yes, I did tell them and they started yelling. They're upset about this.

The Court: What did you tell the group about your—

The Juror: That I think that I knew them. I think I'm pretty sure that I knew them from college, and that's what they did then.

The Court: That's what they did then, you mean do drugs?

The Juror: Dealing drugs. I said that's what they did. I said I can't be 100 percent sure, but pretty sure.

The Court: You didn't just tell one juror, you think you told the whole group?

The Juror: I know they're all really mad. They, like, attacked me.

The Court: You said they think you're crazy. Why?

The Juror: Well, I don't know if they think I'm crazy or what, but they—they all just like—not all of them, most of them attacked me for saying that.

Judge Larimer thereafter asked juror number three to wait in his secretary's office while he met with counsel to discuss the proper course of action.

With counsel present in chambers, Judge Larimer had the court reporter read back the entire colloquy with juror number three. He then stated that, after meeting with juror number three, he was convinced that she was "unbalanced" and "disturbed." Judge Larimer advised counsel that "this woman has to go," but before proceeding to discuss how to specifically deal with the situation, he offered defense counsel the opportunity to confer with their clients. After conferring with their clients, defense counsel agreed with Judge Larimer that juror number three should be excused. Juror number three's belief that she had met the defendants while in college was clearly incorrect. Onaghinor did not arrive in America until some ten years after her supposed encounter, and Williams had no connection to Geneseo, New York. As Judge Larimer concluded, "[i]t just never happened, it couldn't have happened." But still, he had to consider how to limit any effect her comments may have had on the other jurors.

Both defendants' counsel requested a mistrial, but Judge Larimer sought instead to remedy any potential jury taint. First, he decided to proceed with the eleven remaining jurors rather than attempt to telephone the alternate juror whom he had dismissed earlier that day. This was consistent with Federal Rule of Criminal Procedure, Rule 23(b)(3), which states that, "[a]fter the jury has retired to deliberate, the court may permit a jury of 11 persons to return a verdict, even without a stipulation by the parties, if the court finds good cause to excuse a juror." Fed.R.Crim.P. 23.

Next, the judge proposed to address the eleven remaining jurors as a group to discuss what juror number three had told them. He stated to defense counsel: "I think I can cure whatever taint there was by indicating to the other jurors that we have a very troubled, misguided person who has said some things that were inappropriate and totally false and could not have happened, and that it should have no bearing whatsoever. It's just make believe." Counsel for both defendants agreed with this proposed course of action, subject to Judge Larimer's denial of their motions for a mistrial. Indeed, Williams's trial counsel commented, "it sounds like collectively [the remaining jurors] could be addressed because, apparently, they've drawn the same conclusion that Your Honor has." The judge added, "[i]f after I address the jurors you have—I'll ask you to come to side bar. If you wish to have me say anything else, I'll certainly consider that." Again, defense counsel did not object.

With the eleven remaining jurors and defendants present in the courtroom, Judge Larimer then explained to the jury why he had excused juror number three from further deliberations:

> I am convinced that after hearing her tale and my observations of her, that she is disturbed—she is mentally disturbed, in my view. The Court made some inquiries about her past, which I think made that clear to me and also the way that she acted in my presence. So it's unfortunate for her certainly, but that's the basis for my excusing her.

He also made clear that juror number three's belief that she had met defendants in the past was false:

> In your note to me it's apparent that she said to you that she thought she had some contact with both of the defendants. After discussing this with her, it became clear that even she wasn't really sure about that. But I think more to

the point, she made some suggestions to me as to when this happened, 23 or 24 years ago, at an establishment in a college town, Geneseo. That convinces me that she had no contact, that it's a figment of her imagination. For one thing, when this contact allegedly happened, one of the defendants, Mr. Onaghinor, was still in high school and it would be ten years before he even came to this country. So I think that gives you a flavor as to what we really have here. The contact that she described could not have happened.

He continued:

> You should disregard [what juror number three said] for two reasons: Number one, because you always disregard anything that has come to your attention that was not part of the evidence here in the case. That's a basic rule of jury deliberations. But more importantly in this case, you disregard it because it's a figment of her imagination.

Finally, Judge Larimer addressed the remaining jurors' ability to continue deliberations. He stated: "I must ask you ... as a group as to whether in light of these instructions, if you think what did occur was such that it would prevent you from deciding this case based on the evidence that you heard here. Do you all think you can be fair and impartial and decide?" After the jurors collectively nodded their heads, he asked: "Is there any juror that feels the need to talk to me privately in chambers about anything that happened here because you think it might have [a]ffected your view, your independent view of the evidence here?" After no juror expressed a wish to do so, Judge Larimer conferred once again with counsel. Defense counsel had no further requests and made no objection to the judge's procedures. Judge Larimer then instructed the jury to recommence deliberations, and again, to disregard anything juror number three had said. Later that afternoon, the jury found Williams guilty on all counts and Onaghinor guilty on count one.

■ "A district court's investigation of juror misconduct or bias is a 'delicate and complex task.'" *United States v. Cox,* 324 F.3d 77, 86 (2d Cir.2003) (citing *United States v. Abrams,* 137 F.3d 704, 708 (2d Cir.1998)). Therefore, a trial judge "has broad flexibility in such matters, especially when the alleged prejudice results from statements by the jurors themselves, and not from media publicity or other outside influences." *Id.* (quoting *United States v. Thai,* 29 F.3d 785, 803 (2d Cir.1994) (quotation marks omitted)). In addition, a trial judge's handling of juror misconduct and his decisions on a jury's impartiality is reviewed for abuse of discretion. *See id.* at 86; *United States v. Gaggi,* 811 F.2d 47, 51 (2d Cir.1987); *see also Abrams,* 137 F.3d at 708; *United States v. Panebianco,* 543 F.2d 447, 457 (2d Cir.1976). This is because the trial judge is in a unique position to ascertain an appropriate remedy, having the privilege of "continuous observation of the jury in court." *Id.* at 457.

■ Defendants Onaghinor and Williams contend that Judge Larimer abused his discretion by failing to adequately inquire as to the extent of any jury misconduct and taint even though they did not ask him to do so at trial. Specifically, they claim that juror number three's comments to the other jurors revealed improper conduct and premature deliberations; therefore, Judge Larimer should have more extensively examined what effect juror number three's comments had on the remaining eleven jurors and whether other premature deliberations had taken place. The failure was particularly grave, they claim, because Judge Larimer had admonished the jurors at the beginning of the trial to refrain from discussing the case

until after the conclusion of the evidence. Juror number three's admission that she had spoken to another juror the day before deliberations began revealed that some members of the jury failed to adhere to his instructions.

Onaghinor now claims that despite the evidence of jury misconduct, "the court below failed to pose any questions to the jury regarding its premature discussions of the case with juror number three or otherwise amongst themselves." Similarly, Williams now argues that "[t]he Court's questioning was inadequate to address whether the jury was tainted by juror number three's tale" because "[t]he Court never questioned the jurors, either individually or collectively, whether they believed what juror number three told them, or whether it affected their view of the case." They contend that "[a] thorough inquiry would have involved asking specific questions about the taint, what was said by the other jurors, when the tale [of juror number three] was presented to the remaining jurors, and following up with questions posed to individual jurors to determine whether juror number three's tale tainted the jury." Again, neither defendant raised such a claim during the trial.

Instead, with the consent of defense counsel, Judge Larimer made a reasoned decision to deal with any potential jury misconduct or taint by adopting "the swift approach of just telling the jurors, look . . . we've got a very misguided, troubled juror that said things that just could not have happened." It is true that Judge Larimer could have performed a more searching inquiry and asked the questions that defendants now claim were required. Passing over the dispositive fact that the defendants did not ask him to conduct any additional inquiry, *see* Fed.R.Crim.P. 51(b), we have observed that, "any such investigation is intrusive and may create

prejudice by exaggerating the importance and impact of what may have been an insignificant incident." *Abrams*, 137 F.3d at 708. "[W]hile a court looking into juror misconduct must investigate and, if necessary, correct a problem, it must also avoid tainting a jury unnecessarily." *Cox*, 324 F.3d at 88 (citation omitted). Thus, "[i]n this endeavor, sometimes less is more." *Id.*

▄▄ Defendants cite *United States v. Resko*, 3 F.3d 684, 688 (3d Cir.1993), for the proposition that a juror's admission to discussions with another juror about the case before deliberations had begun requires a prompt and detailed inquiry from the trial judge. We agree that "[w]here the district court instructs a jury to refrain from premature deliberation [as Judge Larimer did here], and the jury nonetheless discusses the case before the close of trial, that premature deliberation may constitute juror misconduct." *Cox*, 324 F.3d at 86. But we do not agree that juror number three was engaging in premature deliberations when she told another juror that she knew the defendants. Not every comment a juror may make to another juror about the case is a discussion about a defendant's guilt or innocence that comes within a common sense definition of deliberation. Moreover, however juror number three's comment is characterized, it was within Judge Larimer's discretion to determine whether to inquire more extensively as to what other discussions had taken place among the jurors. In *Resko*, every juror had engaged in premature deliberations, but the trial judge did not investigate beyond a preliminary questionnaire. 3 F.3d at 687–88. The judge therefore had "no way to know the nature of those discussions—whether they involved merely brief and inconsequential conversations about minor matters or whether they involved full-blown discussions of the defen-

dants' guilt or innocence." *Id.* at 690–91. Here, Judge Larimer had a clear idea of the discussion that took place. The day before deliberations began, juror number three confided in one other juror her mistaken belief that she knew the defendants. Judge Larimer did not have reason to suspect that this was a case of anything other than one disturbed juror.

Judge Larimer's examination of whether the jury could be impartial despite juror number three's comments was also within his discretion. Defendants claim that juror number three's comments were the sort of extra-record evidence that by reaching the jury, was "presumptively prejudicial." *See Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954); *Bibbins v. Dalsheim*, 21 F.3d 13, 16–17 (2d Cir.1994). "This presumption, however, may be overcome by a showing that the extra-record information was harmless." *Bibbins*, 21 F.3d at 16 (citing *Remmer*, 347 U.S. at 229, 74 S.Ct. 450).

■ Before questioning the remaining jurors, there was ample indication that juror number three's discussion with the other jurors did not prejudice the defendants. The jury note itself stated that the remaining "11 jurors do not feel comfortable continuing deliberation with juror number three," and according to juror number three herself, the remaining jurors thought she was "crazy." Williams' trial counsel recognized this. He stated, "it sounds like collectively [the remaining jurors] could be addressed because, apparently, they've drawn the same conclusion that Your Honor has." The situation suggested that there was no prejudice because remaining jurors already disbelieved the excluded juror. By proceeding as swiftly as he did, Judge Larimer was able to affirmatively discount the statements of juror number three and instruct the remaining jurors to

disregard what they had heard—something they were apparently already inclined to do—without drawing undue attention to juror number three. Thus, even if we agreed that the comments at issue created a presumption of prejudice among the remaining jurors, that presumption was overcome.

Defendants similarly argue that, by asking the jurors themselves whether they were able to remain impartial after hearing juror number three's comments, Judge Larimer "effectively ceded to the jury [the court's] responsibility for determining whether or not the defendants would be prejudiced by the jurors' misconduct." *Resko*, 3 F.3d at 691. This argument is based on the myopic premise that Judge Larimer relied solely on the collective responses of the jurors to his questions in determining whether the jury was biased against defendants after hearing juror number three's comments. While he did not explicitly articulate the basis for his decision, it is quite clear that Judge Larimer did not need to rely on the jury's answers at all to conclude that the remaining jurors could be impartial—he could have based his conclusion solely on the nature of the alleged misconduct and his curative instruction. But he even went further and asked questions. Again, before he addressed the remaining eleven jurors, Judge Larimer already had sufficient reason to conclude that they disbelieved the statements of juror number three. He then told them why juror number three's beliefs could only have been a figment of her imagination. As he told them this, Judge Larimer was in a position to watch the jurors' reaction. He could also gauge the jurors' responses when he asked whether they could continue to deliberate in an impartial manner. After observing their demeanor, he concluded that the remaining jurors could continue to

deliberate. The collectively posed questions to the jurors hardly support the claim that their answers were decisive rather than confirmatory, or that Judge Larimer "effectively ceded to the jury [the court's] responsibility for determining whether or not the defendants would be prejudiced by the jurors' misconduct." *Id.* at 688. Put differently, the fact that Judge Larimer did not articulate each of the considerations that supported his conclusion does not constitute a basis for assuming that decision reflected anything less than *his* considered judgment or that he "ceded" to the jurors the responsibility for determining that they were not prejudiced. Defendants' counsel may have recognized this common sense reality at trial. Indeed, even if the objections the defendants now raise had not been procedurally forfeited, "counsel's failure to speak in a situation later claimed to be so rife with ambiguity as to constitute constitutional error is a circumstance we feel justified in considering when assessing [defendants'] claims." *Wainwright v. Witt,* 469 U.S. 412, 431 n. 11, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

## II. Defendants' Absence from Conferences about Juror Misconduct

Defendants Williams and Onaghinor also contend that their judgments of conviction should be vacated because Judge Larimer met with defense counsel, and then juror number three, to discuss how to handle any juror misconduct outside the presence of the defendants. Again, no objection was raised at trial regarding Judge Larimer's meeting with defense counsel and juror number three outside the presence of the defendants. Nevertheless, defendants now claim that his decision was plain error requiring reversal.

█ Defendants claim that their absence from Judge Larimer's discussions with and about juror number three violated their constitutional right, as well as their statutory right, to be present. A criminal defendant's constitutional right to be present at various stages of his trial is rooted in the Confrontation Clause of the Sixth Amendment and, when confrontation is not at issue, the Due Process Clause of the Fifth Amendment. *See United States v. Gagnon,* 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985). Federal Rule of Criminal Procedure 43, meanwhile, provides that a defendant must be present at "every trial stage," Fed.R.Crim.P. 43(a)(2), but not at stages where "[t]he proceeding involves only a conference or hearing on a question of law." Fed.R.Crim.P. 43(b)(3).

In *Gagnon,* the Supreme Court reviewed a trial judge's private *in camera* conference with a juror after the juror had expressed concern that one of the defendants, Gagnon, had been seen sketching the jury during trial. 470 U.S. at 523, 105 S.Ct. 1482. After the sketch had been brought to the trial judge's attention, the judge announced that he would speak to the juror. *Id.* at 523–24, 105 S.Ct. 1482. He did so on the record in chambers, in the presence of Gagnon's counsel but not Gagnon or his co-defendants. On appeal, Gagnon and his co-defendants claimed that the *in camera* meeting with the juror violated their rights to be present. *Id.* at 525, 105 S.Ct. 1482. In rejecting this claim, the Supreme Court recognized that "[t]he mere occurrence of an *ex parte* conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right." *Id.* at 526, 105 S.Ct. 1482 (citing *Rushen v. Spain,* 464 U.S. 114, 125–26, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) (Stevens, J. concurring)). It then held that the conference at issue, "a short interlude in a complex trial," "was not the sort of event which every defendant had a right personally to attend under the Fifth

Amendment." *Id.* at 527, 105 S.Ct. 1482. The Due Process Clause only guarantees a defendant the right to be present at a given stage of his trial "to the extent that a fair and just hearing would be thwarted by his absence." *United States v. Rivera,* 22 F.3d 430, 438 (2d Cir.1994) (quoting *United States v. Fontanez,* 878 F.2d 33, 35 (2d Cir.1989)); *see also Snyder v. Massachusetts,* 291 U.S. 97, 107–08, 54 S.Ct. 330, 78 L.Ed. 674 (1934). As the Supreme Court observed, the defendants "could have done nothing had they been at the conference, nor would they have gained anything by attending. Indeed, the presence of Gagnon and the other respondents, their four counsel, and the prosecutor could have been counterproductive." *Gagnon,* 470 U.S. at 527, 105 S.Ct. 1482 (citation omitted).

■ As in *Gagnon,* Judge Larimer's meeting with juror number three did not deprive defendants of any constitutional right or statutory right. In the defendants' absence, Judge Larimer was able to speak candidly with juror number three and ascertain the extent of juror misconduct—the first step in a fair and just hearing. Had defendants been present, they could not have assisted. Indeed, their presence may have prevented juror number three from speaking openly. Defendants' absence from Judge Larimer's subsequent meeting with defense counsel, where they discussed how to proceed in light of juror number three's comments, similarly had no adverse effect on defendants or the fairness of the trial. These meetings were more akin to hearings on an issue of law to which a defendant has little to contribute than to stages of trial at which a defendant has a due process or statutory right to be present. In sum, Judge Larimer's private, on the record meeting with juror number three, followed by reading and discussing the transcript of

that meeting with defense counsel, was neither a due process violation nor a violation of Federal Rule of Criminal Procedure 43; it was an efficient way to assess the extent of any juror misconduct and formulate an appropriate response.

■ Moreover, even if defendants were correct that either Judge Larimer's conference with juror number three, or his subsequent meeting with counsel, was a trial stage at which they had a right to be present under either the Due Process Clause or Federal Rule of Criminal Procedure 43, defendants waived their right by remaining silent. Before Judge Larimer met with juror number three, he met with defense counsel to discuss how he should proceed. Neither defense counsel objected to his proceeding outside the presence of defendants. After Judge Larimer completed his conference, defense counsel was silent again. So too were defendants. Indeed, no one at any point objected to Judge Larimer's decision to meet privately on the record with juror number three in an effort to speak candidly and thereafter read the colloquy to the defense counsel. Defendants' "total failure to assert their rights to attend the conference with the juror sufficed to waive their rights under Rule 43." *Gagnon,* 470 U.S. at 529, 105 S.Ct. 1482. "If a defendant is entitled under Rule 43 to attend certain 'stages of the trial' which do not take place in open court, the defendant *or* his counsel must assert that right at the time; they may not claim it for the first time on appeal from a sentence entered on a jury's verdict of 'guilty.'" *Id.* (emphasis added).

Defendants seek to distinguish *Gagnon* on the ground that they were not made aware that stages of the trial were proceeding without them until after Judge Larimer had met with juror number three and defense counsel. The requirement that the objection be made by "the defen-

dant or his counsel" suggests that the right may be waived or procedurally forfeited by the failure of counsel to object. *Id.* at 529, 105 S.Ct. 1482. But even passing over that fact, in the context of this case, defendants' argument carries little weight. After the transcript of the *ex parte* interview with juror number three was read to defendants' counsel and before the juror was excused, counsel discussed the issue with defendants. If defendants had so desired, they could have asked to have the transcript read back to them so that they could have suggested additional questions. If the defendants' absence from the meetings had been in error, it could have been remedied immediately following the meetings. A rule allowing the defendants, as well as their trial counsel, to stay silent at trial and then claim on appeal that their absence constitutes reversible error will only encourage "sandbagging." *See Garcia v. Lewis,* 188 F.3d 71, 82 (2d Cir.1999); *Nieblas v. Smith,* 204 F.3d 29, 32 (2d Cir.1999).

 Onaghinor and Williams also argue that the *in camera* interview with juror number three deprived them of the assistance of counsel. They contend that by excluding counsel from his *in camera* meeting, Judge Larimer prevented defense counsel from adequately investigating any potential jury taint and thus prevented adequate representation. We disagree. Before meeting with juror number three, Judge Larimer discussed his proposed course with counsel. Counsel did not object. After the meeting, he had the court reporter read back his entire colloquy to counsel and offered them a chance to suggest further action. Again, they did not object. Nor did they suggest a different course or further questions that should be asked of juror number three.

### III. Defendant Williams's Two–Level Sentence Enhancement for Obstruction of Justice

 Williams appeals from Judge Larimer's imposition of a two-level sentence enhancement for obstruction of justice. A two-level enhancement for obstruction of justice is appropriate under the following circumstances:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense . . . .

U.S.S.G. § 3C1.1. Put differently, this adjustment is intended to apply where the defendant "consciously act[s] with the *purpose* of obstruction of justice." *United States v. Stroud,* 893 F.2d 504, 507 (2d Cir.1990). Or, as we stated more recently, it must be based on "conduct that willfully interferes with or attempts to interfere with the disposition of the criminal charges against a defendant." *United States v. Khimchiachvili,* 372 F.3d 75, 80 (2d Cir. 2004). The use of the word "willful" in § 3C1.1 "implies a *mens rea* requirement [and thus] we have generally limited the application of [§ 3C1.1] to those cases in which the defendant had the specific intent to obstruct justice." *United States v. Khedr,* 343 F.3d 96, 102 (2d Cir.2003) (internal quotation marks and citations omitted).

 Judge Larimer adopted the Probation Department's recommendation to enhance Williams's sentence based on four letters Williams had sent from jail to Sabrina Peterson, one of his co-defendants. Judge Larimer presented his reasoning as follows:

The Probation Department added, and the Government urges, that under [§ ] 3C1.1 the Court should find two points for obstruction of justice based on Mr. Williams' letters to co-conspirators in jail urging them not to cooperate with the Government, to maintain certain stories and positions, and to repeat certain versions of events that were not true. There was a fair amount of testimony about this at trial in terms of letters that were written, letters that were received. The Court reviewed those letters and I believe, based on the testimony, that the two point enhancement is absolutely applicable here. I think there was an effort to obstruct justice, to delay the investigation, to get witnesses to stick to the party line.

In other words, he found that Williams was "threatening, intimidating, or otherwise unlawfully influencing a co-defendant [or] witness ... directly or indirectly, or attempting to do so," one of the enumerated types of conduct the Sentencing Commission deemed worthy of the obstruction of justice adjustment in the application notes to U.S.S.G. § 3C1.1. U.S.S.G. § 3C1.1, cmt. n. 4(a). This application note also applies where the targeted co-defendant or witness is still only a potential co-defendant or witness. *See United States v. Feliz*, 286 F.3d 118, 120–21 (2d Cir.2002) (citing *United States v. White*, 240 F.3d 127, 138 (2d Cir.2001)).

■■■ There is no dispute that Williams sent Ms. Peterson the four letters for which Judge Larimer enhanced his sentence and that, at the time, Ms. Peterson was a potential co-defendant or witness against him. The only dispute is whether these letters revealed the required obstructive intent. An obstruction of justice enhancement is subject to a mixed standard of review. *United States v. Cassiliano*, 137 F.3d 742, 745 (2d Cir.1998). A sentencing court's legal interpretations of the sentencing guidelines is reviewed *de novo*. 18 U.S.C. § 3742(e); *United States v. McSherry*, 226 F.3d 153, 157 (2d Cir. 2000). But "[t]he sentencing court's findings as to what acts were performed, what was said, and what the speaker meant by [his] words, and how a listener would reasonably interpret those words will be upheld unless they are clearly erroneous." *Cassiliano*, 137 F.3d at 745; *see also United States v. Gaskin*, 364 F.3d 438, 466 (2d Cir.2004) ("We generally defer to a sentencing court's findings as to what a 'speaker meant by his words, and how a listener would reasonably interpret those words.'" (quoting *United States v. Shoulberg*, 895 F.2d 882, 884 (2d Cir.1990))).

Judge Larimer did not analyze the four letters separately and did not specifically state which of the letters provided the justification for a two-level enhancement. Instead, he concluded generally that the letters as a group provided evidence of an attempt to obstruct justice. Again, he stated: "The Court reviewed those letters and I believe, based on the testimony, that the two point enhancement is absolutely justified. I think there was an effort to obstruct justice, to delay the investigation, to get witnesses to stick to the party line." While his overall finding of fact merits deference, we analyze the individual letters to see if any could support the finding. We turn first to a letter Williams sent to Ms. Peterson on December 5, 1999 that had "Listen to me close" written at the top.

In his December 5, 1999 letter, Williams enclosed a letter that he had received from co-defendant Lonzo Harden. He explained to Ms. Peterson: "Muffin, in your letter you'll see another envelope in their [sic]. That's a letter I received from Lonzo, telling me the question[s] that the 'Feds' ask[ed] him.... Just read the yel-

low paper letter." Significantly, the "yellow paper letter" which Williams had received from Mr. Harden—and which he urged Ms. Peterson to read—provided a detailed account of Mr. Harden's interviews with federal investigators. Harden described what questions he was asked and how he had responded. In it, Harden also urged Williams to tell certain things to Ms. Peterson.

Harden told Williams that the authorities "mostly asked about blackie and cottontail going up north." At trial, Harden explained that this referred to his daughter Katrina Harden (blackie) and Shirley Davenport (cottontail, or rabbit) going to Niagara Falls, Canada, to purchase heroin. In the letter, Lonzo Harden gave precise details of what he told the authorities as to why Katrina Harden and Davenport went to Canada, what they did, and who met with their heroin source. He also wrote, "now they want to bring blackie here to talk with her. But I know she's not going to know anything except what I just said. If she come I'm going to talk with her first." He continued, "if you get in touch with cotton, tell her that when her and blackie went up north, she didn't do anything, she didn't see anybody, or nothing. She just went with blackie because she want to go alone." Harden similarly told Williams, "[i]f you did anything with anybody, I never did meet any of them."

Again, Williams enclosed Harden's letter to him in his letter to Ms. Peterson and asked her to read it. He asked her to send $25 to his co-conspirator Diane Johnson and told her, "we all need to pull together right here." "I don't think they will indict you, but they probably will indict Rabbit. Because Lonzo told them that she went to Canada." Nevertheless, he asked her to "[t]ell my cousin, Rabbit, not to get scare[d] because they really don't have anything on her, lately." He

continued, "I don't believe they [are] going to indict you. But they might. I'm talking about Rabbit. Muffin, you tell them the truth—you just got back with me after my wife Mary die[d]."

Williams's December 5, 2001 letter to Sabrina Peterson must be viewed in context. It is not clear from the text that Williams was suggesting that Ms. Peterson lie or otherwise obstruct the investigation. But as Judge Larimer stated, "[t]here was a fair amount of testimony about this at trial in terms of letters that were written." He heard from Lonzo Harden, who testified at trial that he wrote Williams, in part, so that if Williams spoke to Shirley Davenport, he could make sure "she wouldn't say anything other than what Katrina [Harden] had said." Judge Larimer also heard from Ms. Peterson, who testified at trial that she believed Williams had sent her Harden's letter "[f]or us to understand what Lonzo [Harden] had told the DEA and so everybody's story would corroborate, you know, so everybody would be saying the same thing." Essentially, Judge Larimer agreed with Ms. Peterson that the most plausible understanding of Williams's letter is that it reflected an intent to improperly influence her testimony and "get witnesses to stick to the party line."

As we noted above, "[t]he sentencing court's findings as to what acts were performed, what was said, and what the speaker meant by [his] words, and how a listener would reasonably interpret those words will be upheld unless they are clearly erroneous." *Cassiliano*, 137 F.3d at 745. Viewed in connection with the testimony Judge Larimer heard during the trial, his conclusion that Williams sought to obstruct justice by sending Lonzo Harden's letter to Sabrina Peterson was not clearly erroneous. Williams could have been "unlawfully influencing a co-defen-

dant [or] witness ... directly or indirectly, or attempting to do so." U.S.S.G. § 3C1.1, cmt. n. 4(a). In his letter, Lonzo Harden had provided a notably detailed account of what he had told authorities. Passing that information to other members of the conspiracy may have been a critical step in impeding the investigation. Because various members of the conspiracy were incarcerated or otherwise unable to communicate, sending them Lonzo Harden's letter may have been the only way for Williams to make sure "everybody would be saying the same thing." Williams's subsequent three letters to Ms. Peterson could similarly support Judge Larimer's factual finding.

On December 11, 1999, Williams wrote Ms. Peterson a brief letter that began, "I don't have very much to say." He continued, "I know it's hard but try not to worry so much. Because it's not going to change the outcome." Williams also expressed his anger about someone who had apparently told authorities about Ms. Peterson's criminal involvement. He wondered to Ms. Peterson, "what happen[ed] to the code of the game?" Williams's letter of May 16, 2001 is similar. He sent Sabrina Peterson copies of various cases so that she "will understand they [the federal authorities] can't do anything to us." He then added, "[a]s long as you don't tell on yourself, which might be the truth. But they will use whatever you say against [you]." Williams also asked Ms. Peterson to tell co-defendant Onaghnior that she "will never lie on him." In Williams's June 3, 2001 letter to Ms. Peterson, Williams speculated, "I hope Roland [Onaghinor] don't think you told all them lies on him, that he read in those court papers and get scared and cop-out thinking they going to railroad him." He also cautioned Ms. Peterson about speaking to other inmates for fear that any inmate "might be a plant." He even admonished her to not let people know she was broke because "[a]s long as

people feel like you have money, the[y] will give you everything. When they feel like you don't have nothin' they wont give you nothin'."

These three letters also must be understood in context. On their face they were simply advising Ms. Peterson of her right to remain silent and the danger of speaking with other inmates. But when Williams wrote these letters, he was the subject of a criminal investigation and had already been indicted. Thus, "here we have something more than 'mere' advice." *United States v. Cioffi*, 493 F.2d 1111, 1119 (2d Cir.1974). It was self-serving advice. Such behavior comes within the ambit of obstruction of justice as defined by 18 U.S.C. § 1512 and, by reference, U.S.S.G. 3C1.1:

> The correct view ... is:
>
>> ... [W]hile a witness violates no law by claiming the Fifth Amendment privilege against self-incrimination in a grand jury, one who bribes, threatens, coerces a witness to claim it or advises with corrupt motive a witness to take it, can and does obstruct or influence the administration of justice.
>
> The focus is on the intent or motive of the party charged as an inducer. The lawful behavior of the person invoking the Amendment cannot be used to protect the criminal behavior of the inducer.

*Id.* (citation omitted); *see also Cole v. United States*, 329 F.2d 437, 440 (9th Cir.), cert. denied, 377 U.S. 954, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964); U.S.S.G. § 3C1.1, cmt. n. 4(i). Where the inducer's motive in advising a co-conspirator to remain silent is to impede the investigation against him, rather than to give purely altruistic advice, he is obstructing justice.

Here, there was a sufficient basis for Judge Larimer to conclude that Williams's motive in his later letters was to impede

the investigation against both him and Sabrina Peterson. He wrote to her about how inappropriate it had been for one of their co-conspirators to cooperate with investigators. And he sent her copies of cases to explain that "they [the federal authorities] can't do anything to us. As long as you don't tell on yourself, which might be the truth. But they will use whatever you say against [you]." The natural understanding is that Williams was advising her that Williams and Peterson would be able to thwart the investigation against them as long as she exercised her Fifth Amendment right. Or, as Judge Larimer stated, he was "urging [her] not to cooperate with the Government." Because the words and the surrounding context of the letters support the conclusion that Williams specifically intended to obstruct justice in his advice to Peterson, *see Khedr*, 343 F.3d at 104 ("the existence of alternative explanations [do] not matter [when there is] evidence of words ... by the defendant from which to draw an inference that he specifically intended to obstruct justice"), Judge Larimer's imposition of the two-level enhancement under § 3C1.1 was correct.

We add that, although we have analyzed each of Williams's letters in its own right, Judge Larimer was free to look at the letters as a group and for the light each letter shed on the others. "[I]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts." *Huddleston v. United States*, 485 U.S. 681, 690, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988) (quoting *Bourjaily v. United States*, 483 U.S. 171, 179–80, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987)).

### Conclusion

The judgment of the district court is affirmed. Williams's appeal was briefed and argued before the Supreme Court decided *Blakely v. Washington*. —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). Williams has filed a supplemental brief urging that the Supreme Court's decision in *Blakely* invalidates his two-level obstruction of justice enhancement, as well as a previously unchallenged three-level sentencing enhancement the trial judge had imposed for Williams's role in the offense. The mandate in this case will be held pending the Supreme Court's decision in *United States v. Booker*, No. 04–104, —— U.S. ——, 125 S.Ct. 11, 159 L.Ed.2d 838, 2004 WL 1713654, 2004 U.S. LEXIS 4788 (Aug. 2, 2004) (mem.), and *United States v. Fanfan*, No. 04–105, —— U.S. ——, 125 S.Ct. 12, 159 L.Ed.2d 838, 2004 WL 1713655, 2004 U.S. LEXIS 4789 (Aug. 2, 2004) (mem.), where the Supreme Court has granted petitions for certiorari in cases in which the Solicitor General sought review of the effect of *Blakely* on the Sentencing Guidelines. *See United States v. Mincey*, 380 F.3d 102, 105–06 (2 Cir.2004). Should any party believe there is a need for the district court to exercise jurisdiction prior to the Supreme Court's decision, it may file a motion seeking issuance of the mandate in whole or in part. Although any petition for rehearing should be filed in the normal course pursuant to Rule 40 of the Federal Rules of Appellate Procedure, the court will not reconsider those portions of its opinion that address the defendant's sentence until after the Supreme Court's decision in *Booker* and *Fanfan*. In that regard, the parties will have until 14 days following the Supreme Court's decision to file supplemental petitions for rehearing in light of *Booker* and *Fanfan*.