**UNITED STATES of America,**

v.

**James BOTTI, Defendant.**

**No. 3:08–cr–00230 (CSH).**

United States District Court,
D. Connecticut.

June 8, 2010.

Alina Reynolds, Richard J. Schechter, U.S. Attorney's Office, Bridgeport, CT, Nora R. Dannehy, U.S. Attorney's Office, Hartford, CT, for Plaintiff.

David T. Grudberg, Jacobs, Grudberg, Belt, Dow & Katz, P.C., New Haven, CT, for Defendant.

### *RULING ON DEFENDANT'S MOTION FOR PERMISSION TO INTERVIEW JURORS*

HAIGHT, Senior District Judge:

Defendant James Botti was charged in a three-count indictment with conspiring to commit mail fraud (Count One), the substantive crime of bribery (Count Two), and the substantive crime of mail fraud (Count Three). Count Three alleged that Botti violated the provisions of 18 U.S.C. §§ 1341 and 1346. The case was tried to a jury. The jury convicted Botti on Count Three, specifying in answers to a special verdict form that they were able to reach a unanimous verdict only on a violation of § 1346, engaging in a scheme or artifice to deprive the citizens of Shelton, Connecticut, of the intangible right to the honest services of their public officials. The jury was unable to agree on any other charge, and a mistrial was declared as to them. It is unknown at this point whether Botti will be retried. He is scheduled to be sentenced on September 17, 2010 on the § 1346 violation and for structuring and conspiracy to structure, of which he was convicted at an earlier trial on severed charges.

Botti moved post-verdict for the Court's permission to interview the jurors. [Doc. 324] The government opposed the motion. The Court denied Botti's motion in an order dated May 3, 2010. [Doc. 341] The order stated that an opinion setting forth the Court's reasons for its ruling would issue subsequently. This is that opinion.

## I. BACKGROUND

### A. *The Verdict*

Count One charged Botti with conspiring to violate the mail fraud statute, 18

U.S.C. §§ 1341 *et seq.*, in two ways: devising "a scheme or artifice to defraud, or to obtain money or property by means of false or fraudulent pretenses, representations or promises" in violation of § 1341, and to "deprive another of the intangible right of honest services" in violation of § 1346.[1] The government's theory in that regard was that Botti conspired to deprive the citizens of Shelton, Connecticut of the honest services of their public officials. These are separate schemes. The jury could conclude that the government had proven one but not the other. Accordingly, the special verdict form was structured so that, if the jurors checked the "Guilty" box on Count One, they were instructed to indicate whether they "unanimously find" that (A) Botti "engaged in a conspiracy to deprive the citizens of Shelton of the intangible right of the honest services of their public official or officials (check either no or yes)," and (B) that Botti "engaged in a conspiracy to obtain money or property by means of materially false or fraudulent pretenses, representations or promises (check either no or yes)."

The special verdict form for Count Three, which charged Botti with the substantive crime of mail fraud, similarly distinguished between the two types of mail fraud. Count Two did not present these complications, simply charging Botti with the substantive crime of bribery in violation of 18 U.S.C. § 666(a)(2).

On March 31, during deliberations, the Court excused Juror Number 8 for good cause pursuant to Fed.R.Crim.P. 23(b)(3). The relevant circumstances are described in Part I.C., *infra.* On April 1, the remaining 11 jurors returned a partial verdict of guilty on Count Three, indicating on the verdict form their unanimous finding that Botti used the mails for the purpose of executing a scheme to deprive the citizens of Shelton of the honest services of public officials. As to all the remaining Counts and questions presented in the special verdict form, the jurors reported that they could not reach unanimous agreement. The Court declared a mistrial as to Counts One and Two in their entirety, and as to Count Three insofar as it charged a violation of 18 U.S.C. § 1341. The jury was discharged.

### B. *Defendant's Motion for Permission to Interview the Jurors*

Botti now moves pursuant to Local Civil Rule 83.5, made applicable to criminal cases by Local Civil Rule 1(c), for Court permission to "obtain the services of a licensed private investigator for the purpose of interviewing all of the excused jurors, including Juror Number 8, to determine what information, if any, they have that may be relevant" to the issue of whether "defendant's constitutional right to an impartial jury [was impaired] by extraneous influences and information." [Doc. 324 at 6]

Botti's motion to interview the jurors is based largely on the events leading up to the Court's excusing Juror Number 8 on March 31 and the record generated thereby. While Botti's briefs in support of this motion are long on generalities but short on specifics, they purport to find in the record sufficient evidence to require juror interviews with respect to four questions: (1) whether extraneous prejudicial information was improperly brought to the jury's attention; (2) whether a juror was biased against Botti because of his choice

---

1. The mail fraud statute was first enacted in 1948. Section 1346 was added by an amendment in 1988. Section 1346 expanded the reach of the statute by providing: "For the purpose of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."

of attorney; (3) whether Juror Number 8 felt threatened by other jurors during deliberations; and (4) whether any jurors engaged in premature deliberations.

### C. *The Dismissal of Juror Number 8*

The circumstances surrounding the dismissal of Juror Number 8 are as follows. Jury selection took place on February 24, 2010. The trial began on March 8. The Court commenced charging the jury during the morning of Thursday, March 25. After a lunch break, the charge was concluded and the jury commenced deliberations at 2:15 p.m. No verdict was reached that day. Deliberations resumed on Friday, March 26. The jury did not reach a verdict and was excused for the weekend. Deliberations resumed on Monday, March 29 and continued through March 30, without a verdict.

Shortly after the jury assembled on the morning of Wednesday, March 31, the foreperson of the jury sent a handwritten note to the Court (Ct. Ex. 10), which reads as follows:

Outside material was brought in by 1 juror in regards to the case.

Comments have been made by the same juror about a hung jury prior to all counts being discussed.

How should we move forward.

After discussing the contents of the note with counsel, and with the parties' agreement, I brought the foreperson into the jury box and questioned her on the record in open court. She said that the words on the note were hers, but "I was so upset about writing the note that the juror next to me actually wrote the note." Jury Trial Transcript Excerpt, Vol. 17, March 31, 2010 ("Tr.") at 3. The foreperson explained

that the juror referred to in the note, subsequently identified as Juror Number 8, had that morning brought into the jury room "[t]wo personal journals that she wanted to read to us and we all said, 'Stop right there.'" Tr. 4. The other jurors first saw the journals "when [Juror Number 8] took them out right before we gave you the note." Tr. 5. According to the foreperson, Juror Number 8 said that the journals contained "[s]omething about the case," and that she wanted to read the contents to the other jurors. Tr. 6. "And then one of the jurors got up and said, 'Stop right now.' And we all said we didn't want to hear it." *Id.* The following exchanges then occurred:

THE COURT: Let me put these follow-up questions to you: Thinking back to this morning when those journals were brought in, was there any discussion about what they contained or did it not go that far? Did you have any idea from what this juror said of what the contents of the journals were?

THE FOREPERSON: She said it was a conversation between her and one of the other jurors.

THE COURT: Okay. That was what was in the journal?

THE FOREPERSON: That's what she said.

THE COURT: Yes.[2] Did she identify that other juror?

THE FOREPERSON: Yes.

THE COURT: All right. And did she indicate when this conversation took place?

THE FOREPERSON: I don't recall her saying when it took place.

---

**2.** Throughout this portion of the transcript, the reporter records me as saying "Yeah." It may be false pride, but I prefer to think that I said "Yes," and I have edited the transcript accordingly.

THE COURT: Okay. Did she indicate what the substance of that conversation was?

THE FOREPERSON: No.

THE COURT: No. Just that the journal contained references to a conversation she had with another juror; is that so?

THE FOREPERSON: Yes.

THE COURT: And was that juror identified?

THE FOREPERSON: Yes.

THE COURT: And that's all you know about the content of the journals? It was stopped at that point?

THE FOREPERSON: Yes.

Tr. 16–17.

I also questioned the foreperson about the statement in the second paragraph of her note, Ct. Ex 10, which read: "Comments have been made by the same juror about a hung jury prior to all counts being discussed." These exchanges took place:

THE COURT: All right. So, a time came when this juror mentioned or used the phrase "hung jury;" is that so?

THE FOREPERSON: Yes.

THE COURT: What, as you best can remember, did this juror say about a hung jury?

THE FOREPERSON: Just that it was a hung jury, it would be a hung jury, and we should just sort of finish it now or end it now. . . .

THE COURT: [W]hat you're telling us is that a time came during deliberations when this juror mentioned, used the phrase "hung jury," and then went on to say—this is the sense I've formed from what you just said to me, but don't let me put words in your mouth. If I got it wrong, tell me.

But having mentioned, used the phrase "hung jury," the juror then went on to say in words or substance, "Look, we have a hung jury here, why don't we just stop and say that?"

Is that the substance of what the juror said or have I got that wrong?

THE FOREPERSON: That's the way I understood it.

THE COURT: That's the way you understood it?

THE FOREPERSON: Yes.

THE COURT: And when was that remark first made? Was it made the first time this morning or had it been made previously, earlier?

THE FOREPERSON: Earlier. . . .

THE COURT: [C]an you tell us, do you remember when this juror first made this comment on the subject of a hung jury?

THE FOREPERSON: I remember it being Friday. A couple [of] other jurors thought it was Monday.

THE COURT: I see, yes, yes. When you say "a couple of other jurors thought it was Monday," I gather that there has been some discussion among the jury about this in the jury room; is that so?

THE FOREPERSON: About this note.

THE COURT: Yes, about this note, yes, okay. In any event, is your mind clear that this juror made the hung jury comment at some date earlier than this morning?

THE FOREPERSON: Absolutely.

Tr. 7–11. After conferring with counsel at sidebar, I put further questions on this subject to the foreperson:

THE COURT: Now, a time came during deliberations when this juror used the phrase "hung jury," is that so?

THE FOREPERSON: Yes.

THE COURT: Okay. And without indicating in any way how the jury is presently inclined to vote, what can you tell

us about any response that other jurors may have made when this juror introduced the subject of hung jury; do you see what I'm asking you?

THE FOREPERSON: Yes.

THE COURT: What's your recollection of that?

THE FOREPERSON: Everyone was very upset that we had hardly started and she had made this comment.

THE COURT: That you had hardly started.

THE FOREPERSON: I recall her saying it Friday.

Tr. 19–20.

Before excusing the foreperson, I asked her: "In your view, is this particular juror open and capable of going on and deliberating as jurors should, or not?" The foreperson answered "No." To my follow-up question, "You don't think she can?" the foreperson again answered "No." Tr. 20. Lastly, the foreperson identified the juror whose conduct had prompted the jury's note to the Court as Juror Number 8, and the juror with whom that juror was alleged to have had a discussion as Juror Number 5. Tr. 28.

The foreperson then returned to the jury room. Juror Number 8 was summoned to the courtroom. I began by reading to Juror Number 8 that paragraph in the jury's note, Ct. Ex. 10, which read "Outside material was brought in by 1 juror in regards to the case," and told her that the foreperson, who was Juror Number 2, had just stated that "the outside material was some personal journals that a juror brought in this morning." Tr. 30. These exchanges followed:

THE COURT: My question to you, ma'am, is: Are you the juror who brought in these journals?

JUROR NUMBER 8: Correct, your Honor.

THE COURT: All right. Did they have something to do with the case?

JUROR NUMBER 8: Yes.

THE COURT: What was in them?

JUROR NUMBER 8: First of all, I've been writing journals for 27 years. First—can I say that—and what's in there is, there was an incident before—before we were picked I'd say, you know, one of 12 jurors, I said to juror—what's her number—I think it's Juror Number 5.

THE COURT: Yes.

JUROR NUMBER 8: I said to her, you know, should we tell this incident to Joanne,[3] because I strongly feel we should ask her if we should—we should tell her to Joanne, that Joanne should know about it, if it's okay. And—

THE COURT: Let me interrupt you, what incident are you talking about, whether or not you should talk to Joanne about it?

JUROR NUMBER 8: Well, there are many incidents, okay, many incidents. That's what I was trying to explain to them. And everybody was saying, No, we don't want—we don't want to hear it. We don't want to hear it.

So, okay, they don't want to hear it. Do you want me to tell you what the incidents is all about?

THE COURT: Yes, I guess, in some notion, the nature of them, what they were.

JUROR NUMBER 8: Okay. Like, for example, when we were walking, and I think it's the 23rd, we were walking, going home, and—I don't know her number—but anyway, she said, she just

---

3. This is a reference to Joanne Pesta, the Deputy Court Clerk, whose trial duties included interacting with the jurors to ensure their comfort.

said to me, Oh, you know, we're not supposed to talk to, whatever, the prosecutors or whatever.

And I said, Well, you just said it, you know, hi, and you guys are not supposed to be going this way. You're supposed to be going that way. So, I said, and you just told me, you know, like a second, and then now you're talking. We're not supposed to talk with anybody.

And then she said, The other juror—what her name is, because we all go to the same train,—the other juror—where is it—the other juror—Number 11, she said, Oh that's okay. There's nothing. So, now it continues, when we got to the train station, she started talking about, deliberating about the case again.

So, I said, Please, I don't want to hear about it. Let's, you know, I don't want to be part of it. So, she shut up, but that's only one case.

Tr. 30–33. Because this response lacked clarity, I tried a different approach:

THE COURT: What—tell me again, what were in these journals that you brought in this morning? Were—

JUROR NUMBER 8: Can I just—oh, okay. I brought my journals. I was just saying to—to tell her, Can I just bring my journal? Can I just read what's in there, what's in the journal? It has to do with the—

THE COURT: It—this was a journal that you kept at home; is that right?

JUROR NUMBER 8: Yes.

THE COURT: That you wrote up, they weren't notebooks that you took—notes that were made during this trial?

JUROR NUMBER 8: Oh, no, no. Everybody knows that I write journals for 27 years. It's not making notes at all. That's why I brought it, so I won't be incriminated of anything, but it's a personal journal. I can show it to you. . . .

THE COURT: Tell me this: Why did you bring into the jury room your personal journals, when I have repeatedly instructed the jurors not to bring anything into the jury room, which has not been received into the trial. Why did you do that?

JUROR NUMBER 8: I do that because most of all, I did not remember that part, and second of all, I did that so I can say verbatim what was said. So, I could—I won't make up my—I won't mix up my—my words. That is what is in there. I am willing to show you my journals, yes, then you can decide for that.

Tr. 33, 36. Eventually the juror's journal was produced, marked Ct. Ex. 12, and shown to counsel.

During this interrogation of Juror Number 8, I also attempted to address the other topic raised in the foreperson's note:

THE COURT: [L]et me ask you another question: The foreperson's note says this: "Comments have been made by the same juror"—that's you—"about a hung jury."

Let me ask you this question: Have you, during the deliberations, used the phrase "hung jury," have you mentioned that out loud?

JUROR NUMBER 8: Correct.

THE COURT: And what did you say about a hung jury?

JUROR NUMBER 8: Because like, for example, what page is it—what happened is, back and forth, back and forth, people calling names. We couldn't get a consensus, you know, we're always—

THE COURT: I don't want to know anything about that. I don't want to know anything—I don't want to know anything about how the jury's minds

**196**

were or what they were thinking of doing.

But I do want you to tell us what it was that you said about a hung jury. JUROR NUMBER 8: Well, what I said when somebody made a comment—I don't know if I can say this, one juror—I don't know if I can say this—one juror said, Oh, you know, I made my decision after that whole trial, but I waited after the trial. And he paid—he got the best lawyer, the best lawyer in New Haven.

And can you—you want more? I'll tell you more. Why is that—why is that—that—that hung jury was opened. And first of all, they don't want me to hear.

I said, I gave a note to them, and said, Here, give this note also to the judge.

And they said, No, we don't want your notes. That's one-sided. I have the right to talk to you.

Tr. 34–35.

The transcript reflects the difficulty of following and understanding Juror Number 8's words, which were spoken rapidly, sometimes disjointed, and sometimes seemingly tinged by anger. And the Court did not have much success in getting the juror to respond directly to questions.

The record contains two writings prepared by Juror Number 8. The first is the journal, Ct. Ex. 12, that she brought into the jury room that morning. During a colloquy between Court and counsel, the deputy court clerk said: "And she also has a note, a handwritten note, herself, that she wrote." Tr. 48. At defense counsel's request, Juror Number 8's note was produced, marked Ct. Ex. 11, and shown to counsel. I consider the contents of these documents in turn.

Juror Number 8's journal is a curious document. It is a notebook, 8 % inches by 5 % inches with unnumbered bound pages,

by which I mean the pages are not loose-leaf and removable, but fastened in place. The journal contains handwritten entries describing events in the juror's personal life. Court Exhibit 12 is comprised of 14 and a fraction pages of entries covering the period during which jury selection and the trial occurred. These pages include comments by the juror on her experiences as a first-time juror and the trial. The curious aspect of the journal lies in the chronological order of the entries, or more accurately, the lack of order. The earliest date of entry is February 15, 2010 and the latest is March 23, 2010. As one turns the pages in the customary manner, the entry dates run consecutively from and including February 15 to and including February 27. There is no entry for February 28, a Sunday. The entry dates thereafter run in this sequence: March 11, March 10, March 9, March 8, March 7, March 6, March 5, March 4, March 3, March 12, March 23, March 22, March 21, March 20. These chronological mysteries are not fully explained by the juror's response to my inquiry on the point:

> THE COURT: It seems the earlier dates are here, and then you go forward this way; is that right?
>
> JUROR NUMBER 8: Yes, because your Honor, sometimes my brain is exhausted coming home. So, that's why the dates are not in order.

Tr. 41–42.

The provenance of Juror Number 8's handwritten note, Ct. Ex. 11, and the circumstances of its creation are established by the record.

As stated *supra*, the foreperson's note expressing the jury's concerns, Ct. Ex. 10, was delivered shortly after all jurors had assembled to resume deliberations on the morning of March 31. That timing corroborates the foreperson's account in response to the Court's questions that as soon as or

shortly after Juror Number 8 arrived in the jury room, she produced her journal and told the other jurors that she wished to read passages from it to them. The other jurors quite properly refused to listen to this extraneous material. The foreperson promptly composed her note advising the Court of this incident, and added the jurors' expression of concern about Juror Number 8's reference to a hung jury "prior to all counts being discussed." It is fair to assume that the wording of the foreperson's note was discussed in the jury room in the presence of all the jurors, including Juror Number 8, who must have been upset by the other jurors' criticisms and the content of the foreperson's note. Juror Number 8 wanted to send a note of her own to the Court, but the other jurors opposed her doing so. This is the meaning I ascribe Juror Number 8's statement to me, in the context of the dates of the journal entries, that "there are more stuff there that was not written last night, but *I took notes today, because they don't want to give it to you, which is kind of unfair.*" Tr. 42 (emphasis added).

The foreperson left the jury room and gave the factual account in open court, as described *supra*. The other jurors, including Juror Number 8, remained in the jury room. During that period of time, when the atmosphere in the jury room must have been somewhat tense, Juror Number 8 added to the note which became Ct. Ex. 11.

The physical characteristics of the note are revealing. It is a single sheet of paper, notebook size, with handwriting on both sides. One side has centered in the middle three lines in large letters, whose content and appearance I will reproduce as accurately as my word processor will allow:

Please judge I
wanted to talk to
you.

Following those words, Juror Number 8 signed her full name. In the spaces above and below these centered words and signature, additional notations appear, in smaller lettering, with further notations on the reverse side of the page. These notations are numbered, from the top of the first page, although the numbering is imprecise: two notations bear the number "3," and the numbers of the notations on the reverse side are "7" and "9", with no number 8. I find on this record that Juror Number 8 wrote the larger centered words and signed them at the time she told the other jurors she wanted to submit her note to the Court together with theirs. The jurors having rebuffed that suggestion, Juror Number 8 added the smaller notations on both sides of the page while the foreperson was in the courtroom answering the Court's questions about *her* note.

Some of the notations are illegible. The top three notations, numbered 1, 2 and 3, have two horizontal lines drawn through them, as if the writer intended to cross out the contents. Other notations are legible and purport to describe conduct, events and comments by unidentified individuals. The note does not specify the dates and times of the incidents and comments, but some clearly occurred during the jury's deliberations.

The first of these is the notation "9 jurors y—3n," which appears to indicate that the jury was dividing 9 to 3 in favor of conviction as deliberations progressed.

The second is a notation upon which Botti's present motion principally relies. It reads: "Botti is guilty—he got the highest paid lawyer in N.H."[4] Botti argues that this remark is evidence of juror bias

---

4. "N.H." presumably indicates the city of New Haven, where the trial took place.

tainting the trial. The question then becomes when the alleged remark about Botti's counsel was made. During her questioning by the Court, Juror Number 8 acknowledged that she uttered the phrase "hung jury." I credit the foreperson's statement to the Court that Juror Number 8 spoke those words after the jury had begun deliberating. The Court asked Juror Number 8: "But I do want you to tell us what it was that you said about a hung jury." Juror Number 8 responded:

"Well, what I said when somebody made a comment—I don't know if I can say this, one juror—I don't know if I can say this—one juror said, Oh, you know, I made my decision after that whole trial, but I waited after the trial. And he paid—he got the best lawyer, the best lawyer in New Haven."

Tr. 35.

If one accepts the truth of that account, it shows that the unidentified juror making the remark in question waited until the trial was over and deliberations had begun before making this observation regarding Botti's guilt and defense counsel's pay. The timing of the comment is important, for the reasons stated in Part II.B., *infra*.

At the conclusion of these events, and in the exercise of my discretion, I excused Juror Number 8 from the trial and proceeded with a jury of 11 in accordance with Fed.R.Crim.P. 23(b)(3), which provides: "After the jury has retired to deliberate, the court may permit a jury of 11 persons to return a verdict, even without a stipulation by the parties, if the court finds good cause to excuse a juror." Good cause existed to excuse Juror Number 8 because, despite the Court's repeated instructions that jurors should not do so, she brought extraneous material (her journal) into the jury room for the purpose of continuing an argument about an entirely irrelevant incident (the chance encounter between two jurors and the defendant in a courthouse elevator). In addition, good cause existed because Juror Number 8 declared that there was a hung jury early in the deliberations, before the jury had even discussed all the counts, which understandably disturbed the other jurors, as reflected in the foreperson's note. When, during deliberations, it becomes apparent that a juror cannot or will not participate appropriately in the deliberative process, Rule 23(b)(3) authorizes the trial judge to excuse the juror and take a verdict of 11. *See, e.g. United States v. Manzano–Excelente*, 101 F.3d 1393, 1996 WL 414465 (2d Cir. July 25, 1996).[5]

After Juror Number 8 was excused and left the courthouse, I placed the remaining 11 jurors in the jury box, and told them I had excused Juror Number 8 because she had brought certain materials into the jury room.[6] I told the jurors to put that incident "entirely out of your minds" because "your task as jurors remains exactly the same." Tr. 52. I repeated instructions previously given, during jury selection, throughout the trial, and in the jury

---

**5.** Botti's briefs on this motion and on his motion for a new trial [Doc. 339], which asserts the same jury improprieties, do not contend that the Court abused its discretion in excusing Juror Number 8. Had such an objection been made in Botti's post-verdict motions, the Court would have rejected it for the reasons stated in text.

It is proper to add that while I found it necessary to excuse Juror Number 8, that in no way reflects a conclusion that she acted in bad faith or with intentional impropriety.

**6.** At the request of defense counsel, joined by the prosecutors, I did not tell the jurors that an additional reason for excusing Juror Number 8 was her reference to a "hung jury." Counsel for both parties preferred that the Court not refer, directly or implicitly, to the possibility of a hung jury.

charge: the defendant is presumed innocent of all the charges; the government's burden is to prove his guilt beyond a reasonable doubt; each juror "must decide the case for yourself in accordance with my instructions on the law," "you must consult with one another and deliberate with a view to reaching agreement;" however "you should not surrender your honest beliefs as to the weight or effect of evidence solely because of the opinions of other jurors. In all instances, your vote must be your own." Tr. 52–53.

I then asked the jurors a series of questions, directing them to raise their hands if they would answer any in the affirmative. Those questions were: (1) "During the course of your deliberations, has anyone attempted to discuss the case with you outside your jury room?" (2) "Have any of you discussed the case with anyone else outside discussions in the jury room?" (3) "Has any other juror discussed the case with you while in the jury room, but before all the jurors are there?" Tr. 54–55. No hands were raised. I concluded with the following question, polling each juror individually after posing it:

Do any of you feel that as a result of what happened this morning or for any other reason you cannot act as an impartial and fair-minded juror in this case, finding the facts in accordance with the evidence or the lack of evidence, and in accordance with my instructions on the law?

Tr. 55–56. To that question, each juror responded "No." I directed the jurors to resume deliberations. On April 1 the jury returned the verdict described in Part I.A., *supra*.

During the succeeding days, there were contacts between certain jurors, the Court, and counsel. Juror Number 8 sent the Court a letter dated April 5, 2010. [Doc. 322] She complained that the foreperson had denied her right to speak to the Court, that she was threatened by another juror on Tuesday, March 30, and the foreperson wrongfully refused to include an account of that threat in the note the foreperson sent to the Court on March 31. The Court put this letter on the docket under seal and sent copies to counsel for the government and the defendant.

The government sent the Court and defense counsel a letter dated April 12, 2010, [Doc. 342], advising that two jurors had communicated with the prosecutors after the jury was dismissed. One juror, referred to as "Juror A," approached AUSA Schechter shortly after the verdict was returned and the jury discharged and asked to speak to him. AUSA Schechter properly told the juror to give his contact information first to a federal agent. An IRS agent prepared a memorandum dated April 1 which recited the juror's name and telephone numbers, and remarks that the juror had made (contrary to AUSA Schechter's request not to do so) about the deliberations, the numerical split between the jurors, and Juror A's feelings about the case. The government's letter of April 12 also enclosed an unsolicited e-mail to AUSA Schechter from another juror, "Juror B," containing similar comments. Lastly, the government sent the Court and defense counsel a letter dated April 30, 2010, [Doc. 349], containing a report by an FBI agent who was a neighbor of Juror A, to whom Juror A on April 1 made remarks about the trial and deliberations in the same vein as his earlier remarks on that day to the IRS agent. All these documents were shared by the Court and counsel and placed under seal.

In these circumstances, Botti asks permission to conduct interviews of all trial jurors, including Juror Number 8.

## II. DISCUSSION

### A. *Standard of Review*

Following the return by a jury of a verdict of guilty, a request by a convicted defendant to interview the jurors, while not uncommon, is not favored in Second Circuit jurisprudence. "Post-trial jury scrutiny is disfavored because of its potential to undermine full and frank discussion in the jury room, jurors' unwillingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople." *United States v. Stewart*, 433 F.3d 273, 302 (2d Cir.2006) (citation and internal quotation marks omitted). The Second Circuit went on in *Stewart* to explain the requirements for allowing post-verdict interviews of jurors:

> Accordingly, probing jurors for potential instances of bias, misconduct or extraneous influences after they have reached a verdict is justified only when reasonable grounds for investigation exist, in other words, where there is clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial. The inquiry should end whenever it becomes apparent to the trial judge that reasonable grounds to suspect prejudicial jury impropriety do not exist.

*Id.* at 302–03 (citation and internal quotation marks omitted). The trial court has broad discretion in dealing with such issues. In *United States v. Peterson*, 385 F.3d 127 (2d Cir.2004), the Second Circuit said:

> A district court's investigation of juror misconduct or bias is a delicate and complex task. Therefore, a trial judge has broad flexibility in such matters, especially when the alleged prejudice results from statements by the jurors themselves, and not from media publicity or other outside influences. In addition, a

trial judge's handling of juror misconduct and his decisions on a jury's impartiality is reviewed for abuse of discretion. This is because the trial judge is in a unique position to ascertain an appropriate remedy, having the privilege of continuous observation of the jury in court.

*Id.* at 134 (citations and internal quotation marks omitted). Most recently, the Second Circuit said in *United States v. Sabhnani*, 599 F.3d 215 (2d Cir.2010):

> We review a trial judge's handling of alleged jury misconduct for abuse of discretion. A trial judge has broad flexibility in responding to allegations of such misconduct, particularly when the incidents relate to statements made by the jurors themselves, rather than to outside influences. We have stated, moreover, that district judges should be particularly cautious in conducting investigations into possible jury misconduct after a verdict, and that such investigations are only warranted when there is clear, strong, substantial and incontrovertible evidence, that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant. .... This case presents no clear, strong, substantial and incontrovertible evidence of juror misconduct, and accordingly the district court properly determined that no further investigation was merited and that the motion for a new trial should be denied.

*Id.* at 250 (citations and internal quotation marks omitted). These Second Circuit cases and the cases they cite set a high bar for permitting post-verdict interviews of jurors, and confer upon this Court broad discretion in deciding whether to permit them. I conclude that Botti's motion for permission to interview the trial jurors must be denied because he has failed to meet this standard.

## B. *Botti's Contentions*

Botti's main brief [Doc. 324] begins by asserting that: "The record demonstrates that extraneous material was introduced into the jury's deliberation room, and that outside influences may have improperly been brought to bear upon jurors during deliberations. Further, the record demonstrates that Juror Number 8 was concerned that irregularities may have been present in the jury's deliberative process." His main brief expands on those assertions at 4–5:

> A substantial record has been made that irregularities occurred in the deliberative process. First, the testimony of both the jury foreperson, as well as Juror # 8 on Wednesday, March 31, 2010 demonstrates that Juror # 8 brought extraneous material into the jury room during deliberations, and that extraneous information had been presented to the jurors by Juror # 8.

> Additionally, during the course of the testimony from Juror # 8, the Court accepted, as a Court exhibit, a note [Sealed Court Exhibit 11] which Juror # 8 had prepared as a guide to informing the Court of certain concerns. Those concerns included allegations that jurors had been conversing about the case—outside the deliberative process, and that at least one juror had prejudged the case and informed other jurors of that fact.

"These circumstances," Botti's main brief concludes at 5, "demonstrate irregularities in the jury process which may have imperiled defendant's constitutional right to an impartial jury unimpaired by extraneous influences and information," and the Court should allow Defendant to conduct interviews by "a licensed private investigator" of "the excused jurors, including Juror # 8, to determine what information, if any,

they have that may be relevant to those issues."

Botti's reply brief [Doc. 334] reiterates the contentions in his main brief and adds comments about the letters and contacts since the verdict involving Juror Number 8, Juror A and Juror B. Addressing the questions the Court put to the 11 remaining jurors, Botti's reply brief at 2 says that "certain areas were not explored, such as juror bias, as well as a potential threatening situation between Juror # 8 and Juror # 15—which did not come to the Court's and parties' attention until after the conclusion of the trial." In a footnote, the brief argues that the comments expressed by Jurors A and B "demonstrate the heated nature of the jury room [*sic*], and lend credibility to Juror 8's allegation of feeling threatened—a subject unrelated to the substance of the jury's deliberations." Botti's reply brief at 6 also further explicates his theory of juror bias:

> Court Exhibit 11 makes a very serious allegation that at least one juror was biased against defendant for his choice of attorney. "Botti is guilty—he got the highest paid lawyer in N.H." At this time, it is unclear which juror was alleged to have said this. The issue of juror bias, which directly impacts defendant's right to a fair trial and impartial jury, was not explored by the Court on March 31, 2010, and has been reasonably demonstrated in Court Exhibit 11.

Finally, Botti's reply brief argues in summation at 7:

> Here, the totality of the circumstances— the extraneous material, the bias allegations of Court Exhibit 11, the allegations of Juror # 8 in her April 5, 2010 letter, as well as the communications from Juror A and Juror B—warrant post-trial investigation to ensure that defendant received a fair trial and impartial jury.

### C. *Analysis*

The circumstances cited by Botti, considered alone or in combination, do not justify a postconviction interrogation of the trial jurors.

■ The "extraneous material" Juror Number 8 brought into the jury room on March 31 was her personal journal. She wanted to read passages to the other jurors, but they stopped her immediately and sent me the foreperson's note reporting the incident. The jurors never heard or saw any of the journal's contents.

Moreover, it would make no difference to this analysis if the jurors had permitted Juror Number 8 to read from her journal, because the journal contains no information that would taint the trial or the jury's deliberations. To the extent that the journal refers to the trial at all, which is minimal, the entries consist for the most part of Juror Number 8's personal impressions of counsel and the evidence, impressions that each of the other jurors undoubtedly formed for themselves. There is also a detailed discussion of an incident occurring on March 9, the second day of the trial, when Botti entered a courthouse elevator containing Juror Number 8 and another juror named Jeanne. The journal says: "Jeanne and I did not talk to Botti about the trial at all." That reticence was, of course, entirely proper, and the journal does not suggest that Botti said anything to the jurors. Jeanne and Juror Number 8 disagreed with each other about whether they should report this innocent and unremarkable occurrence to the Deputy Court Clerk, with Jeanne expressing the sensible view that there was no need to do so. Juror Number 8 felt strongly to the contrary, writing in her journal that "we have to let them [clerk and judge] know at least for the record for sure." This is apparently the incident Juror Number 8 had in mind when she told the Court, in response to questions about why she had brought in the journal, that she wanted to read it to the other jurors to document what she perceived as improprieties. Significantly, while defense counsel received a copy of the journal entries on March 31, defendant's briefs on this motion do not point to any specific prejudicial material in them, and there is none. But this point does not really arise, because the other jurors refused to hear passages from the journal, properly recognizing that "outside material . . . in regards to the case" (to quote the foreperson's note) could not be introduced into the deliberations.

■ As for the unidentified juror's purported remark about the cost of Botti's legal representation, contained in Juror Number 8's note, Ct. Ex. 11, I have found for the reasons stated in Part I.C., *supra*, that *if* another juror made such a remark, he or she did so during deliberations. I qualify my observation because it is worth noting that in her verbal reiteration of the alleged comment, Juror Number 8 claimed that the other juror said, "And he paid—he got the best lawyer, the best lawyer in New Haven," whereas in her note, Juror Number 8 wrote, "Botti is guilty—he got the highest paid lawyer in N.H." Therefore, the attribution of guilt as a result of having a highly paid attorney may not have come directly from the other juror's words as Juror Number 8's note seems to suggest, but rather may simply be the meaning that Juror Number 8 herself attached *to* the *other juror's observation* that defendant had retained "the best lawyer in New Haven."

However, this question cannot be further pursued because the Rules of Evidence prohibit the pursuit. While it can be argued—indeed, Botti does argue—that such a statement by a juror, if made, was inappropriate, even suggestive of bias, the statement was made during deliberations;

and Fed.R.Evid. 606(b) bars any inquiry into it for the purpose of testing the validity of the verdict. Rule 606(b) provides:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith.

The Rule could not be more broad or explicit. It reflects the drafters' policy-grounded concern, as expressed by the Advisory Committee Notes to 1972 Proposed Rule 606(b) that: "[t]he mental operations and emotional reactions of jurors in arriving at a given result would, if allowed as a subject of inquiry, place every verdict at the mercy of jurors and invite tampering and harassment." To which, one may add in the context of the present motion, place every guilty verdict in a criminal case at the mercy of a defendant dissatisfied by his conviction, hoping that his inquiry into the deliberations might unearth a statement by a juror that the defendant could point to as evidence of purported bias. The Supreme Court voiced that concern in *McDonald v. Pless*, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915):

[L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was

intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference.

*Id.* at 267 (quoted and cited by the Advisory Committee Notes to the 1974 Enactment of the Rule). More recently the Supreme Court said, albeit in a different context:

A contrary conclusion would require speculation into what transpired in the jury room. Courts properly avoid such explorations into the jury's sovereign space, and for good reason. The jury's deliberations are secret and not subject to outside examination.

*Yeager v. United States*, — U.S. —, 129 S.Ct. 2360, 2368, 174 L.Ed.2d 78 (2009) (holding that an apparent inconsistency between a jury's verdict of acquittal on some counts and its failure to return a verdict on other counts does not affect the preclusive effect of the acquittals under the Double Jeopardy Clause).

Nor is the disappointed litigant the only potential source of improper post-verdict investigation: the Senate Report accompanying the 1974 Enactment of Rule 606(b) observed that the Rule would prevent "the harassment of former jurors by losing parties as well as the possible exploitation of disgruntled or otherwise badly-motivated ex jurors." Senate Report No. 93–1277, 1974 U.S.C.C.A.N. 7051, quoted in the Advisory Committee Notes for the 1974 Enactment of Rule 606(b). That principle resonates in the case at bar because Juror Number 8 was clearly angry with the other jurors who, through the foreperson's note, had complained to the Court about her conduct. Her anger was manifest as Juror Number 8 responded to the Court's questions, and in the April 5, 2010 letter she wrote to the Court, which indicated her desire to file a lawsuit based upon

what had transpired during her jury service. [Doc. 322]. A former juror's sense of having been wronged is ripe for exploitation by a defendant seeking to overturn his conviction.

Because no juror may testify about statements made during deliberations, a defendant or his counsel may not conduct post-verdict interviews of jurors to ascertain what a juror may have said. The defendant would presumably offer up the perceived fruits of such interviews in the form of affidavits or written statements, upon which a motion attacking the validity of the verdict would be based. The last sentence of Rule 606(b) forecloses that enterprise: "A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying."

It would of course be wrong, and contrary to the Court's repeated instructions, for a juror to think Botti's guilt could be inferred from his choice of counsel, or to express that thought to other jurors (although it is far from clear that this occurred). However, the remark, if uttered at all, was spoken during deliberations, and may not be inquired into. One may reasonably assume that if jury deliberations were transcribed and subjected to post-verdict analysis, a disappointed litigant would frequently be able to identify a remark possibly indicative of bias or some other impropriety and demand an investigation of the jurors. For the policy reasons stated *supra*, Rule 606(b) precludes such an inquiry.[7]

For these reasons, I hold that neither the conduct of Juror Number 8 in bringing her journal into the jury room nor the "highest paid lawyer in N.H." comment recorded in her note justify postverdict interviews of the jurors.

Botti's additional justifications for juror interviews are unpersuasive and do not require extended discussion.

■ He claims that "jurors had been conversing about the case—outside the deliberative process." Main Brief at 5. The claim is based upon Juror Number 8's statement in court that another juror, Number 11, was "talking about, deliberating about the case again" on the train when three jurors were riding to or from the trial. It is also based upon a notation in Juror Number 8's note, Court Exhibit 11, which is partially illegible but seems to say: "talk in the train—about the getting the internet."

■ To be sure, jurors may not discuss a case until the parties have rested, counsel have summed up, the judge has charged the jury, and deliberations begin, and then only when all are present in the jury room. The jurors in this case were repeatedly given those instructions. My

---

7. Given these policy considerations, Second Circuit cases addressing possible juror bias typically focus on allegations that a juror failed to disclose relationships or other personal circumstances during the *voir dire* selection process. *See, e.g., Stewart,* 433 F.3d 273. The convicted defendant argued on appeal that a juror's failure to disclose five personal matters "raise[d] doubts about his impartiality which justifies further inquiry in a hearing." *Id.* at 304. The Second Circuit held that "a party alleging unfairness based on undisclosed juror bias must demonstrate first, that the juror's *voir dire* response was false and second, that the correct response would have provided a valid basis for a challenge for cause." *Id.* at 303. The trial judge rejected defendant's juror bias claim without holding a hearing. The Second Circuit affirmed. *Compare United States v. Vitale,* 459 F.3d 190 (2d Cir.2006) (district court abused its discretion in failing to conduct post-trial hearing on possible juror bias based on post-trial disclosure that prosecutor's husband and juror's husband worked at same institution and knew each other). These concerns do not arise in the case at bar.

constant admonition, whenever the jury left the jury box, was: "The jury may withdraw. Do not discuss the case." While any discussion of or reference to the trial by train-commuting jurors should not have occurred, a conclusion that it occurred or that Botti was denied a fair trial because of it would be sheer speculation, and improbable in all the circumstances of the case.

In *Sabhnani*, 599 F.3d 215, after the verdict, a news photographer told defense counsel that while sitting in his car outside the courthouse at the end of a trial day, he thought he heard one of a group of departing jurors "saying the words 'guilty, guilty' in a laughing manner." *Id.* at 248–49. The trial judge refused defendants' request for a hearing including testimony of all the jurors. The judge concluded that

> [E]ven if the speaker had been shown to be a member of the Sabhnani jury and to have been referring to the case, "[o]ne juror's potentially out-of-context, single word comment, does not demonstrate that the jurors prematurely deliberated [and] does not demonstrate that the juror would be unreceptive to opposing arguments or that any juror failed to participate in deliberations in good faith."

*Id.* at 249 (quoting the district court's opinion denying the defense motion for a new trial and a hearing including jury testimony). The Second Circuit also observed in *Sabhnani:*

> The judge noted based on his own observations that the Sabhnani jury had "carefully and intently followed all of the testimony and the presentation of the evidence with close attention."

*Id.* at 249–50 (again quoting the district court).

In the case at bar, I closely observed the trial jurors, during the trial, summations, and charge, and during the answers the jurors gave to the Court during the inquiry on March 31. I am satisfied that all the jurors, with the exception of Juror Number 8, performed their duties responsibly. Furthermore, there is no reason to suppose that prejudicial extraneous information from any source tainted the jury deliberations. These jurors responded immediately and negatively when Juror Number 8 attempted to read from her journal. They reported the incident to the Court because they knew that their verdict must be based upon the evidence or lack of evidence, and extraneous matter could not be considered.

A trial judge's observations of jurors is germane to the judge's resolution of issues such as these. *Peterson*, 385 F.3d 127, is also instructive. The relevant facts closely resemble those in this case. During deliberations, the trial judge received a jury note stating that " '11 jurors do not feel comfortable with juror number three,' and according to juror number three herself, the remaining jurors thought she was 'crazy.'" *Id.* at 136. The judge interviewed juror number three and excused her. He then brought the remaining eleven jurors into the courtroom, explained why he had excused the number three juror, instructed the jurors to disregard anything she might have said, and asked the jurors "[i]f you think what did occur was such that it would prevent you from deciding this case based on the evidence you have heard here. Do you all think you can be fair and impartial and decide?" *Id.* at 134. The jurors collectively nodded their heads. The trial judge instructed them to resume deliberations. The jury returned verdicts of guilty later that day. On appeal, the Second Circuit rejected defendants' contention that the trial judge should have conducted a further inquiry, stating at 136:

> Again, before he addressed the remaining eleven jurors, Judge Larimer al-

ready had sufficient reason to conclude that they disbelieved the statements of juror number three. He then told them why juror number three's beliefs could only have been a figment of her imagination. As he told them this, Judge Larimer was in a position to watch the jurors' reaction. He could also gauge the jurors' responses when he asked whether they could continue to deliberate in an impartial manner. After observing their demeanor, he concluded that the remaining jurors could continue to deliberate.

In the case at bar, I reached the same conclusion after a similar exercise, augmented by an individual poll of the jurors to confirm their collective silence when asked if any felt they could not be impartial and find the facts solely on the basis of the evidence and the Court's instructions.

■ In seeking to interview the jurors, Botti also relies on Juror Number 8's allegation that another juror threatened her. It is difficult to understand why this should prompt a further investigation of the jurors. Assuming *arguendo* that another juror inappropriately threatened Juror Number 8 during deliberations, she was excused for unrelated reasons and did not participate in the verdict. Therefore the other juror's assumed misconduct could not have prejudiced Botti. Different concerns would arise if another juror threatened Juror Number 8 and she then voted to convict the defendant, since it could be argued that the verdict was coerced, although even then Second Circuit authority appears to require that physical harm be threatened to justify post-verdict relief. *See Anderson v. Miller*, 346 F.3d 315, 329 (2d Cir.2003) (affirming denial of habeas corpus relief) ("We agree with Judge Block that, at most, Jurors Nos. 2 and 11 felt themselves to be under pressure, perhaps even under du-

ress, to vote in favor of conviction. But we do not find that a reasonable juror, standing in the shoes of Juror Nos. 2 and 11, would have thought herself to be facing a physical assault if she refused to vote for conviction."). Since Juror Number 8 did not vote on the verdict in this case, there is no need to conduct an inquiry into whether another juror threatened her and in what manner before she was excused. There is no allegation before the Court that any juror who actually voted on the verdict was threatened by any other juror.

■ Finally, Botti contends that the post-verdict letters, Juror Number 8's letter to the Court and Jurors A and B's letters to the government, require further juror inquiries. They do not, either singly or collectively. Under Rule 606(b), the three legitimate areas of post-verdict jury inquiry are whether extraneous prejudicial information was improperly brought to the jury's attention, or whether any outside influence was improperly brought to bear upon any juror, or whether there was a mistake in entering the verdict on the verdict form. None of these letters contains anything relevant to those concerns.

### III. CONCLUSION

Having considered all of Botti's arguments in support of his motion for permission to interview the trial jurors [Doc. 324], I conclude that they fail to show clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety occurred which could have prejudiced the trial. That was Botti's burden under Second Circuit case law, and he did not sustain it. In consequence, I denied his request.